INTERSTATE PRINTING COMPANY, A NEBRASKA CORPORATION,
APPELLANT, V. DEPARTMENT OF REVENUE AND DONALD S.
LEUENBERGER, TAX COMMISSIONER OF THE STATE OF NEBRASKA,
APPELLEES.

459 N.W.2d 519

Filed August 17, 1990.    No. 88-483.

Larry L. Ruth and David D. Cookson, of Knudsen, Berkheimer, Richardson & Endacott, and Louis M. Bruckner, of Finlayson, McKie & Fisk, for appellant.

Robert M. Spire, Attorney General, and L. Jay Bartel for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Pursuant to the Administrative Procedure Act, Interstate Printing Company (Interstate) appeals the order of the district court affirming an order of the state Tax Commissioner dismissing Interstate's protest and petition for redetermination of sales tax and use tax deficiencies assessed by the Nebraska Department of Revenue (department).

Interstate is a printing company located in Omaha. During the period May 1, 1982, through April 30, 1985, Interstate used prepress supplies (developing fluid) in the prepress process and sold prepress materials to its printing customers prior to use of the materials in the prepress or printing process. The department audited Interstate for the period in question and assessed a use tax on the developing fluid used and sales tax on the sale of the prepress materials to Interstate customers. Interstate protested the assessment and petitioned for

redetermination.

After making certain adjustments to the notice of deficiency determination, the department caused a hearing to be held before a hearing officer, following which the state Tax Commissioner determined Interstate's protest and petition for redetermination to be without merit and denied the relief prayed for by Interstate.

Interstate appealed to the district court for review under Neb. Rev. Stat. § 84-917 (Supp. 1989), as it existed before July 1, 1989, which court found as follows: "[T]he Order of the Commissioner was supported by competent, material, and substantial evidence; it was not in excess of the statutory authority or jurisdiction of the agency; it was not affected by errors of law; and it was not arbitrary nor capricious."

As the petition instituting proceedings for review was filed in the district court before July 1, 1989, under Neb. Rev. Stat. § 84-918 (Supp. 1989), this court reviews the matter de novo on the record.

This court raised on its own motion the question of jurisdiction to hear this appeal under the rule expressed in *Collection Bureau of Lincoln v. Loos*, 233 Neb. 30, 443 N.W.2d 605 (1989), and succeeding cases.

The order of the district court affirming the decision of the commissioner was entered on March 7, 1988. A motion for a new trial and a separate motion for an order nunc pro tunc were filed on March 17, 1988. The district court in effect sustained the motion for an order nunc pro tunc by amending the order of March 7, 1988, and then overruled the motion for a new trial "as to order as corrected," all on April 25, 1988. Interstate's notice of appeal was filed on May 24, 1988.

On the surface it appears obvious that as to the March 7, 1988, order which is in fact being appealed, the notice of appeal was not filed until May 24, 1988, some 68 days after entry of the order and well outside the limits for perfecting an appeal. This, of course, disregards the motion for a new trial.

A motion for a new trial is restricted to a trial court, and where the district court acts in the capacity of an appellate court, such a motion is not a proper pleading and it does not stop the running of time for perfecting an appeal. This is true

whether that court is hearing appeals from the county court or from some other lower tribunal. See, *Russell v. Luevano*, 234 Neb. 581, 452 N.W.2d 43 (1990); *In re Conservatorship of Mosel*, 234 Neb. 86, 449 N.W.2d 220 (1989); *In re Guardianship and Conservatorship of Sim*, 233 Neb. 825, 448 N.W.2d 406 (1989); *Collection Bureau of Lincoln v. Loos, supra.*

Without more, the appeal would seem to be out of time, and this court would have no jurisdiction. However, Interstate argues that it was necessary to amend the district court's order of March 7, 1988, before there was any final order from which to appeal because the order had not affirmed the commissioner's order of July 9, 1987.

The order of the Tax Commissioner which was appealed to the district court was entered on July 9, 1987. The petition of Interstate prayed that "the order of the State Tax Commissioner entered herein on July *10*, 1987 be reversed . . . ." (Emphasis supplied.) The order of the district court recites that Interstate has "appealed from an Order dated July 9, 1987" (apparently the correct date), but in the decretal portion of its order it recites that "the Order dated *December 2, 1986* be affirmed . . . ." (Emphasis supplied.) Following the filing of Interstate's motion for an order nunc pro tunc, the court made a minute entry which recited that the "[o]rder dated March 7, 1988 [is] amended nunc pro tunc as to the last paragraph to reflect the correct date as July 9, 1987."

The office of an order nunc pro tunc is to correct a record which has been made so that it will truly record the action had, which through inadvertence or mistake was not truly recorded. It is not the function of an order nunc pro tunc to change or revise a judgment or order, or to set aside a judgment actually rendered, or to render an order different from the one actually rendered, even though such order was not the order intended. *Continental Oil Co. v. Harris*, 214 Neb. 422, 333 N.W.2d 921 (1983).

In *Gunia v. Morton*, 175 Neb. 53, 56, 120 N.W.2d 371, 373 (1963), the distinction between clerical errors and judicial errors was discussed:

A court of record has inherent authority to amend its records so as to make them conform to the facts. It is

proper for a court to make an entry nunc pro tunc so that its records will speak the truth. [Citation omitted.] Such an order is proper to correct the record of a judgment, but not to correct the judgment itself. Clerical errors may be corrected by an order nunc pro tunc but judicial errors may not.

It does not seem that we have ever answered directly the question as to whether the entry of an order nunc pro tunc extends the time within which an appeal must be perfected. The courts of other states appear to have answered this question not as to whether an order nunc pro tunc extends the time within which to appeal but, rather, as to whether the order amends or modifies a judgment in a material or substantial respect or whether the amendment relates only to the correction of a clerical or formal error.

The general rule is that where a judgment is amended in a material and substantial respect, the time within which an appeal from such determination may be taken begins to run from the date of the amendment, although where the amendment relates only to the correction of a clerical or formal error, it does not affect the time allowed for appeal.

4 Am. Jur. 2d *Appeal and Error* § 308 at 793 (1962). See, also, *Mulder v. Mendo Wood Products, Inc.*, 225 Cal. App. 2d 619, 37 Cal. Rptr. 479 (1964), *cert. denied* 379 U.S. 844, 85 S. Ct. 85, 13 L. Ed. 2d 50; *Faddis v. Woodward Iron Company*, 276 Ala. 283, 161 So. 2d 486 (1964).

If the amendment of a final judgment or decree for the purpose of correcting a "clerical error" either materially alters rights or obligations determined by the prior judgment or creates a right of appeal where one did not exist before, the time for appeal should be measured from the entry of the amended judgment. If, however, the amendment has neither of these results, but instead makes changes in the prior judgment which have no adverse effect upon those rights or obligations or the parties' right to appeal, the entry of the amended judgment will not postpone the time within which an appeal must be taken from the original decree.

*Mullinax and Mullinax*, 292 Or. 416, 430, 639 P.2d 628, 637 (1982).

We believe this rule makes good sense, and we adopt it for guidance in situations such as this.

No record other than the minute entry made by the judge supports the entry of the order "nunc pro tunc." We do not know upon what his decision was based. Was it a clerical error or was it an error in the judgment? Clerical errors may be corrected by an order nunc pro tunc, but judicial errors may not. *Larson v. Bedke*, 211 Neb. 247, 318 N.W.2d 253 (1982), *supp. op.* 212 Neb. 134, 322 N.W.2d 367.

Judicial errors may be corrected by modification or vacation of the judgment entered. A district court has inherent power to modify its judgment during the term in which the judgment was rendered. According to the rules of procedure for the district court for Lancaster County found on file with the office of the Clerk of the Supreme Court, March 7 and April 25, 1988, are within the same term of court.

The order of March 7, 1988, was a nullity. It affirmed an order that did not exist. There was no evidence that this was a clerical mistake. Therefore, it was not correctable by an order nunc pro tunc. Although not denominated as such, the fact remains that the court modified its judgment to order the affirmance of a different order than that originally referred to, and therefore the court's action had the effect of a modification to correct a judicial error.

The amendment or modification of the final judgment affirmed an order then extant and accordingly "create[d] a right of appeal where one did not exist before," and "the time for appeal should be measured from the entry of the amended judgment." Accordingly, the appeal was within time and this court does have jurisdiction, and we therefore will deal with the appeal on its merits.

Interstate is engaged in business in Nebraska as a printer, manufacturing products such as catalogs, government publications, programs, forms, educational materials, pamphlets, and advertising literature to the order of its customers. Interstate employs the offset lithography method of printing as the means of producing the finished printed goods

that it manufactures for its customers.

Offset lithography gets its name from the fact that the lithoplate itself does not come in direct contact with the paper or other substrate undergoing printing. Instead, the inked image formed on the surface of the lithoplate is transferred to the paper by an intervening roller or cylinder. The flexible lithoplate is mounted on the press' plate cylinder. In a continuous cycle, first a series of dampened rollers picks up a film of watery fountain solution from a supply and spreads the solution over the surface of the revolving lithoplate. Next, a similar system of inking rollers comes into contact with the lithoplate, spreading a film of ink which adheres to the printing areas of the plate. Wetted and inked, the plate cylinder revolves in contact with the blanket cylinder, which is covered with a rubbery surface. The ink on the lithoplate, now organized as the image to be printed, sticks to the surface of the blanket cylinder. An impression cylinder revolves in contact with the blanket cylinder. The paper or other medium to be printed is introduced between the impression and blanket cylinders, and the ink on the surface of the blanket cylinder is transferred to the paper as it squeezes through the point of contact of the cylinders.

There are at least five distinct preparatory "prepress" operations which precede the printing process just described. The steps can be referred to by the item of prepress that is the output: (1) camera (negatives), (2) stripping flats, (3) proofs, (4) composites, and (5) lithoplate. This description of the prepress process assumes that the printer has been supplied with clean, sharp, camera-ready art and textual material to be printed.

In the "camera" stage, the camera-ready art and textual material is photographed. Development of the film results in negatives, where the dark and light areas of the photographed image are represented by corresponding transparent and opaque areas on the film—a reversal of the values in the material that was photographed. Developing fluid of appropriate chemical properties is used to dissolve the photosensitive emulsion that coats the transparent film base. The developer is washed away when it has done its job. The resulting negative consists of the same piece of film which was

exposed in the camera.

In the "stripping" stage, the negatives from the camera stage are trimmed and physically positioned and taped down in proper relation to one another on a base material. The layout of the negatives is guided not only by the desired look and content of any particular page, but also by the consideration that multiple pages may be printed by a single lithoplate, requiring that the pages must appear in proper relation to one another in order to facilitate further operations, such as two-sided printing, cutting, and assembly of the printed document. The resultant assemblage of negatives is called a flat. The technician performing the stripping operation cuts out window spaces from the base material so that light can pass through the transparent portions on the negatives.

In the next prepress stage, "proofing," light is shined through the flat, exposing photosensitive paper positioned on the other side of the negatives. In a typical finished "blue line" proof, the background areas are white, while the areas exposed to light shining through the transparent portions of the negatives turn blue. The point of the proof is to simulate through photographic techniques the result that would be achieved by mechanical printing processes using a lithoplate "burned" from the same flat. Proofs are primarily used to obtain customer approval of layout and content and to spot and plan necessary corrections and changes to the flat, all prior to consumption of lithographic plates and valuable press time.

Complex print jobs may call for "composites" to be made. This involves multiple exposures of the same piece of photographic film before developing, in order to add and combine elements on the resultant negative, building up the overall image that will be printed. An example of the use of compositing techniques would be the addition of blocks or a grid of screen shading to a catalog page consisting of columns and rows of numbers, thereby providing reference points for scanning across the page and relieving its monotonous look. The table of numbers and the blocks of shading can be photographed separately on the same piece of film, so that on the developed negative the numbers and shading are superimposed.

In the final prepress stage, the lithographic plate is imaged and developed. A typical raw plate consists of a thin aluminum sheet that has a factory-applied light-sensitive polymer coating. The lithoplate is imaged or "burned" by exposing the coated surface to intense light shined through the negatives that have been assembled into the flat. Composite burns of the same plate are possible. Where light strikes the coating of the plate, it undergoes a hardening chemical change that allows those areas to resist the solvent action of the developing fluids. When developed, the printing areas of the plate retain a coating, while the nonprinting areas have been stripped of the polymer coating and show the base metal of the plate. Once it has dissolved unexposed areas of the lithoplate, the developing fluid is washed away.

Under Interstate's standard operating procedures and its usual understanding with customers, all prepress items on a particular printing job—negatives, stripping flats, proofs, composites, and lithoplates—are deemed sold to its customers as they are bought from the outside or created in-house, prior to any use of the items for the purpose to which they are suited. Put another way, upon the acquisition or creation of prepress items, Interstate regards the items as appropriated to a contract of sale, and, therefore, Interstate treats the articles as the property of its customers. Should a customer request it, Interstate would consider itself bound to deliver a prepress article to its customer without exacting a further charge for the item. Interstate buys such prepress items or their ingredient or component parts on a "sale for resale" basis.

The record reveals that Interstate retains physical custody of its customers' prepress items at the time they are created in-house or acquired from outside suppliers. The uniform practice of Interstate is to use the prepress items as they are needed in the sequence of technical operations that will lead to eventual shipment of the customer's completed print order out the door of the Omaha plant. The customer's negatives go into the stripping flats, the customer's flats are used to burn proofs, the customer's proofs are used to make corrections to the flats, the corrected flats or composites are used to burn the lithoplates, the lithoplates are mounted on a press, and finally

the job is run. This practice of leaving prepress items in the custody of Interstate is agreeable to its customers. Interstate understands that it is authorized to retain and use the prepress items on behalf of the customers, as their agent. While any of the prepress items could be an end object in itself—and frequently they are in the case of specialty shops—Interstate's involvement with a customer ordinarily results in the delivery of finished printed goods.

Interstate assigns as error in its first five assignments the findings of the district court regarding statutory specifications found in § 84-917 relating to substantial evidence, jurisdictional authority, errors of law, claimed arbitrary and capricious findings made by the commissioner, and findings contrary to the facts. Interstate also declares that the district court erred in failing to find that the prepress items were ingredients of the final product and entered into the final product and therefore were exempt under Neb. Rev. Stat. § 77-2702 (Reissue 1986).

A sales tax is imposed "upon the gross receipts from all sales of tangible personal property sold at retail in this state . . . ." Neb. Rev. Stat. § 77-2703(1) (Reissue 1986). A use tax is imposed "on the storage, use, or other consumption in this state of tangible personal property purchased, leased, or rented from any retailer . . . for storage, use, or other consumption in this state . . . ." § 77-2703(2).

The general theory behind the sales and use taxes is to impose a tax on each item of property, unless specifically excluded, at some point in the chain of commerce. See *Pepsi Cola Bottling Co. v. Peters*, 189 Neb. 271, 202 N.W.2d 582 (1972). If the item is purchased in Nebraska, the sales tax applies. If the item is purchased outside of Nebraska, the use tax applies.

Section 77-2702(11)(a) and (20) provides exemptions from the sales and use taxes for materials that enter into and become an ingredient or component part of a product manufactured, processed, or fabricated for ultimate sale at retail. See *Nucor Steel v. Leuenberger*, 233 Neb. 863, 448 N.W.2d 909 (1989). Without the exemptions, such materials would in effect be taxed twice, once while in their original condition and then again as part of the final product.

Under § 77-2702(11)(a), "[r]etail sale or sale at retail" does not include the sale of "[t]angible personal property which will enter into and become an ingredient or component part of tangible personal property manufactured, processed, or fabricated for ultimate sale at retail." Interstate argues that a part of each item of the prepress, i.e., the image, "enters into and becomes an ingredient or component part of" the finished product sold to the customer, and therefore the sale of prepress items is exempt from the sales tax under § 77-2702(11)(a). According to Interstate, the image, defined by Interstate as the arrangement of matter in a manner perceived by the senses, is "tangible personal property" within the meaning of § 77-2702(18) ("personal property which may be seen, weighed, measured, felt, or touched or which is in any other manner perceptible to the senses"), and the image enters into and becomes an essential ingredient or component part of the final printed product.

In making this argument, Interstate ignores the express language of the statute, which provides an exemption from the sales tax by excluding from the definition of "retail sale or sale at retail" *the sale of* tangible personal property which will enter into and become an ingredient or component part of the final product. Assuming, without deciding, that an image is tangible personal property, in the sales at issue Interstate was not selling an ingredient or component part of the finished printed product, i.e., the image; rather, it was selling items of prepress on which the image could be seen. The customer provides that "ingredient-component part" image by providing the camera-ready art and textual material, the image of which is to appear on the finished printed product.

Interstate uses items of prepress—camera negatives, flats, composite film (if necessary), and lithographic plates—not to supply the image but, rather, to *convey* the "ingredient-component part" image through the process to the finished printed product. (Excluded from the foregoing list of prepress items are the proofs, which are used to see what the image looks like but not to convey the image to the next prepress stage.) Use of the prepress items to convey the image is somewhat analogous to use of the cellulose casings at issue in

*American Stores Packing Co. v. Peters*, 203 Neb. 76, 277 N.W.2d 544 (1979), as a mold in the manufacture of skinless meat products. Like the cellulose casings, each item of prepress is merely an instrumentality or utensil used in the process and is not property being incorporated into the product.

As an alternative theory for entitlement to exemption, Interstate requests that the court apply § 77-2702(11)(a) in such a manner that the "and" between "enter into" and "become an ingredient or component part of" be read in the disjunctive as if it were an "or." Interstate points out that the exemption from the use tax found in § 77-2702(20) applies to tangible personal property "which will enter into *or* become an ingredient or component part" of the final product. (Emphasis supplied.) According to Interstate, if § 77-2702(11)(a) is not read in the disjunctive, it is theoretically possible that an item of tangible personal property which "enters into" but does not "become an ingredient or component part of" the final product will be exempt from tax if bought out of state, but subject to tax if bought in state. Interstate fails to explain how something can enter into the final product, other than accidentally or incidentally, and not become an ingredient or component part of the final product.

However, we need not decide whether to apply § 77-2702(11)(a) as if written in the disjunctive. Even if we were to do so, Interstate still would not be entitled to exemption from the sales tax for the sale of prepress items and from the use tax for the developing fluid.

Citing *State Bd. of Equalization v. Cheyenne Newspapers*, 611 P.2d 805 (Wyo. 1980), Interstate argues that the prepress items and developing fluid "enter into" the final product in an economic sense and therefore are exempt from sales and use taxes under § 77-2702(11)(a) and (20), whether or not the items "become an ingredient or component part of" the final printed product. Interstate's argument is unavailing. Nebraska's statutory scheme does not exclude from taxation material necessary to or consumed in the manufacturing process but which does not actually enter into the final product as an ingredient or component part. See *Nucor Steel v. Leuenberger*, 233 Neb. 863, 448 N.W.2d 909 (1989).

On a de novo review of the record, we find that Interstate has failed to prove that its sales of prepress items are exempt from the sales tax and that the developing fluid is exempt from the use tax. Therefore, the order of the district court affirming the order of the Tax Commissioner is affirmed.

AFFIRMED.