49 P.3d 382

**Lewis W. POE, Petitioner Appellant–Appellant,**

v.

**HAWAI'I LABOR RELATIONS BOARD, State of Hawai'i, Appellee Appellee–Appellee,**

·and

**Hawai'i Government Employees Association, AFSCME, Local 152, AFL–CIO, Intervenor Appellee–Appellee.**

No. 24313.

Supreme Court of Hawai'i.

July 10, 2002.

As Amended July 26, 2002.

Reconsideration Denied Aug. 1, 2002.

Lewis W. Poe, on the briefs, Honolulu, appellant pro se.

Valri Lei Kunimoto, on the briefs, Honolulu, for Appellee, Hawai'i Labor Relations Board.

James E.T. Koshiba and Lisa Anne Gruebner, on the briefs, Honolulu, for Appellee, Hawai'i Government Employees Association.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ.; RAMIL and ACOBA, JJ., not joining.[1]

Opinion of the Court by MOON, C.J.

Petitioner appellant-appellant Lewis Poe filed a notice of appeal on May 25, 2001, twenty-nine days after entry of a second amended judgment (filed April 26, 2001), but more than thirty days after entry of the first amended judgment (filed April 17, 2001) and the original judgment (filed March 8, 2001).[2] Because we hold that the alteration to the April 17 amended judgment, resulting in the issuance of the April 26 second amended judgment, was merely a correction of a clerical error, the time for appealing the above-captioned matter is measured from April 17, 2001—the date the first amended judgment was entered. Accordingly, Poe's May 25, 2001 filing of his notice of appeal is untimely and must be dismissed for lack of appellate jurisdiction.

## I. *BACKGROUND*

Poe is a public employee and a member of Bargaining Unit 03 of the Hawai'i Government Employees Association, AFSCME, Local 152, AFL–CIO [hereinafter, HGEA]. In 1997, he petitioned the Hawai'i Labor Relations Board (HLRB) for a declaratory ruling that Hawai'i Revised Statutes (HRS) § 89–10(a) (1993) (requiring employee ratification of any collective bargaining agreement) applied to a 1997 Memorandum of Agreement (MOA) between public employers and the HGEA. Poe contended that the MOA, which implemented alternative work schedules for Unit 03 members, was invalid because it was not ratified by the members. In 2000, the HLRB dismissed Poe's petition as moot, finding that the MOA, which had expired in 1997, was superceded by provisions of a 1997–1999 collective bargaining agreement for Unit 03 members.

Thereafter, Poe appealed the HLRB's decision to the circuit court, pursuant to HRS § 91–14 (1993), and was assigned Civil No. 00–1–3007. The HGEA had participated as "intervenor" in Poe's case before the HLRB and was designated "intervenor-appellee" in Poe's appeal before the circuit court. On February 26, 2001, the circuit court entered an order affirming the HLRB's dismissal of Poe's petition as moot. In the order, the circuit court also sua sponte: (1) consolidated Civil No. 00–1–3007 with Civil No. 00–1–3725, another case in which Poe had appealed an HLRB decision concerning the 1997 MOA; (2) determined that, because Civil No. 00–1–3725 raised identical issues as in Civil No. 00–1–3007, further briefing and argument was not necessary; and (3) affirmed that HLRB decision as well. Judgment in favor of HLRB and HGEA and against Poe in Civil Nos. 00–1–3007 and 00–1–3725 was entered on March 8, 2001.

Poe then moved for reconsideration of the March 8, 2001 judgment pursuant to Hawai'i Rules of Civil Procedure Rule 59(e). The circuit court denied reconsideration of the judgment as it pertained to Civil No. 00–1–3007, but granted reconsideration with regards to Civil No. 00–1–3725. In so doing, the court rescinded the consolidation as well as the judgment in favor of HLRB and HGEA in Civil No. 00–1–3725. On April 17, 2001, the circuit court entered the first amended judgment in favor of the HLRB and HGEA and against Poe only as to Civil No. 00–1–3007.

However, the April 17 amended judgment designated HGEA as "intervenor-appellee" in the body of the document, but as "respondent-appellee" in the caption of the case. On April 26, 2001, the circuit court sua sponte entered a second amended judgment, cor-

---

1. A separate opinion or opinions will be filed subsequently.

2. The original judgment and all subsequent amended judgments were entered by the Honorable Eden Elizabeth Hifo, presiding.

recting the caption of the April 17 amended judgment by changing HGEA's designation from "respondent-appellee" to "intervenor-appellee," consistent with the designation reflected in the body of the document. In all other respects, the first and second amended judgments were identical. On May 25, 2001, twenty-nine days after entry of the second amended judgment and thirty-eight days after entry of the first amended judgment, Poe filed a notice of appeal in the instant case.

## II. *DISCUSSION*

■■■■ "In each appeal, the supreme court is required to determine whether it has jurisdiction." *Wong v. Wong*, 79 Hawai'i 26, 29, 897 P.2d 953, 956 (1995). "Without jurisdiction, a court is not in a position to consider the case further." *Id.* "An appellant's failure to file a timely notice of appeal is a jurisdictional defect that can neither be waived by the parties nor disregarded by the court in exercise of judicial discretion." *Id.;* Hawai'i Rules of Appellate Procedure (HRAP) Rule 26(b) ("[N]o court or judge or justice is authorized to change the jurisdictional requirements contained in Rule 4 of [the HRAP])."

In civil cases, "the notice of appeal shall be filed within 30 days after entry of the judgment or appealable order." HRAP Rule 4(a)(1). As previously stated, the judgment in this case (*i.e.,* Civil No. 00–1–3007) was originally entered on March 8, 2001, which included consolidation with another of Poe's cases. Upon reconsideration, an amended judgment was entered on April 17, 2001, to reflect the rescission of the consolidation order and judgment in the other civil matter. The first amended judgment was subsequently corrected, sua sponte, so as to reflect HGEA's proper party designation, and a Second Amended judgment was entered April 26, 2001. Poe's May 25, 2001 notice of appeal was filed within thirty days after entry of the April 26 second amended judgment, but more than thirty days after entry of either the original March 8 judgment and the April 17 first amended judgment. The question on appeal, therefore, is: From what date is the time for appeal measured?

In *Korsak v. Hawai'i Permanente Medical Group*, 94 Hawai'i 297, 12 P.3d 1238 (2000),

this court adopted the following rule as a guide in determining whether an amendment of an order or judgment affects the time for appeal:

> The general rule is that where a judgment is amended in a material and substantial respect, the time within which an appeal from such determination may be taken begins to run from the date of the amendment, although where the amendment relates only to the correction of a clerical ... error, it does not affect the time allowed for appeal.

Moreover,

> [I]f the amendment of a final judgment or decree for the purpose of correcting a "clerical error" either materially alters rights or obligations determined by the prior judgment [or decree] or creates a right of appeal where one did not exist before, the time for appeal should be measured from the entry of the amended judgment. If, however, the amendment has neither of these results, but instead makes changes in the prior judgment which have no adverse effect upon those rights or obligations or the parties' right to appeal, the entry of the amended judgment will not postpone the time within which an appeal must be taken from the original decree.

*Korsak,* 94 Hawai'i at 304, 12 P.3d at 1245 (quoting *Interstate Printing Co. v. Department of Revenue,* 236 Neb. 110, 459 N.W.2d 519, 522–23 (1990) (other citations omitted)); *accord Federal Trade Comm'n v. Minneapolis–Honeywell Regulator Co.,* 344 U.S. 206, 211–12, 73 S.Ct. 245, 97 L.Ed. 245 (1952) (immaterial revision of judgment does not extend time for seeking review of original judgment); *DeGale v. Krongold, Bass & Todd,* 773 So.2d 630 (Fla.App.2000) (amendment of judgment correcting clerical error not impacting on rights and obligations of parties does not affect time for appealing original judgment); *CC–California Plaza Associates v. Paller & Goldstein,* 51 Cal. App.4th 1042, 59 Cal.Rptr.2d 382, 385 (1996) (amendment substantially changing form of judgment starts new time for appeal); *Nielson v. Gurley,* 888 P.2d 130, 132–33 (Utah App.1994) (amendment of judgment not af-

fecting substantive rights of parties does not affect time for appealing original judgment); *Matter of Marriage of Mullinax*, 292 Or. 416, 639 P.2d 628 (1982) (amendment of decree correcting clerical error and materially changing rights of parties starts new time for appeal); *Kolasz v. Levitt*, 63 A.D.2d 777, 404 N.Y.S.2d 914 (1978) (resettlement of judgment containing no material or substantial change does not affect time for appealing original judgment); *City of Newark v. Fischer*, 3 N.J. 488, 70 A.2d 733 (1950) (correction of judgment as to immaterial clerical error does not affect time for appealing original judgment).

 The rule adopted in *Korsak* is applicable to this case. Because the April 17 amended judgment rescinded the original judgment as to the related consolidated case (*i.e.*, Civil No. 00-1-3725), it also materially altered rights determined by the original March 8 judgment. On the other hand, the April 26 second amended judgment merely corrected HGEA's designation in the caption of the April 17 amended judgment (*i.e.*,

changing "respondent-appellee" to "intervenor-appellee") and, thus, did not materially alter any rights or obligations determined by the April 17 amended judgment and did not create a right of appeal where one did not exist. Because the correction was clerical in nature and had no adverse effect upon any rights or obligations or the parties' right to appeal, we hold that the time for appealing the judgment in the instant case is measured from April 17, 2001—the entry of the first amended judgment—and not from April 26, 2001—the entry of the second amended judgment. Accordingly, Poe's notice of appeal should have been filed no later than May 17, 2001, thirty days after entry of the first amended judgment. Because the notice of appeal was filed on May 25, 2001, the appeal is untimely. Consequently, we dismiss Poe's appeal for lack of appellate jurisdiction.

## Dissenting Opinion of ACOBA, J., with whom RAMIL, J., Joins.

I respectfully disagree with the majority opinion,[1] which establishes the vague and

---

1. However, although I disagree with the rule adopted and the subsequent result in this case, I agree with the decision to publish this decision. The Hawai'i chapter of the American Judicature Society (AJS) last month issued a report regarding the abundance of unpublished opinions in our jurisdiction. *See* REPORT OF AJS SPECIAL COMMITTEE ON UNPUBLISHED JUDICIAL OPINIONS Hawai'i CHAPTER OF AMERICAN JUDICATURE SOCIETY § IV (2002) [hereinafter Report]. In recommending that unpublished opinions be allowed to be cited as "persuasive" authority, the Report characterized the use of unpublished opinions as a "problem":

 *There is a problem perceived by the legal community with the continued use of summary disposition orders* and, particularly, *the inability to cite memorandum opinions despite the fact that these opinions appear to be of substantial length and content and often cite other case law as precedent for the conclusions.*

 *Id.* at § 4 (emphasis added). The Report also refers to a considerable amount of unpublished law that could otherwise serve as precedent:

 *[T]he Committee notes that a significant body of law has developed through the use of unpublished opinions and orders.* While these opinions and orders are admittedly non-precedential by virtue of their non-publication and hence, non-binding in any other action or proceeding, they are nonetheless instructive to litigants and counsel alike (and presumably would be to the deciding court if they are permitted to be cited) as to how the appellate

 courts may view cases or issues of similar import to the case or issue in question.

 *Id.* at § III. C. (emphasis added).

 The importance of published opinions cannot be understated in a legal community where the lack of precedent has been characterized as a "problem." Part of the problem is surely that practitioners and judges are left without guidance from the appellate courts. I adhere to my position in *Zanakis–Pico v. Cutter Dodge, Inc.*, 98 Hawai'i 309, 47 P.3d 1222, 1239 n. 1 (2002) (Acoba, J., concurring) that we should publish for the benefit of all concerned. *See id.* ("Because I believe that we should endeavor to provide as much guidance as possible to the parties, counsel, and the trial courts, I wholeheartedly agree with the decision to publish this opinion."). Presumably, precedent would preclude future appeals in many cases, or, as in the present case, give notice to appellants as to when a notice of appeal must be filed in order to preserve the right to appeal. Moreover, the appellate process would be more efficient if law clerks, judges, and justices do not have to "reinvent the wheel." *See John v. State*, 35 P.3d 53, 64 (Alaska Ct.App. 2001) (Manheim, J., concurring) ("[S]o many of our decisions are unpublished that, given enough time and enough change of personnel, the court 'forgets' we issued those decisions.").

 Significantly, published opinions allow for the dissemination of alternative views on legal issues—a process necessary to the development of case law. Thus, as I have indicated before, where there is a concurring or dissenting opin-

uncertain post-act test that, only where "the correction [to a judgment is] clerical in nature and ha[s] no adverse effect upon any rights or obligations[,]" majority opinion at 419, 49 P.3d at 385, is an amended judgment an appealable judgment or order pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 4. In doing so, the majority opinion creates uncertainty for appellants as to whether an amendment sufficiently "materially alter[s] any rights or obligations[,]" *id.*, to deem an order or judgment as one from which the appeal should be taken.

In my view, the better reasoned and fairer approach would be to treat the period for filing an appeal as running from the entry of an amended judgment, unless that amended judgment is specifically entered *nunc pro tunc*, giving unwary litigants notice that the entry date of the amended judgment is not to be relied upon in calculating time pursuant to HRAP Rule 4. This would provide a definite and unequivocal standard, rather than a murky test in a situation where unpredictability and doubtfulness should not play a part.

## I.

In the present case, Petitioner Appellant-Appellant Lewis W. Poe relied upon the filing date of the Second Amended Judgment

---

ion, the decision, in my view, should be published—a proposition germane to those expressed in the Report. *See ABA Standards of Appellate Courts* § 3.37, at 63 (1977)("A concurring or dissenting opinion should be published if its author believes it should be; if such an opinion is published the majority opinion should be published as well.").

*An opinion should be published upon the request of a concurring or dissenting justice.* In 1981, a study sponsored by the Federal Judicial Center investigated, *inter alia*, the rate of publication of those opinions in which a separate opinion was written, indicating a split decision. *See* William L. Reynolds & William M. Richman, *An Evaluation of Limited Publication in the United States Courts of Appeals: The Price of Reform*, 48 U. Chi. L.Rev. 573, 612 (1981) [hereinafter *The Price of Reform* ]. *The researchers agreed that "[n]onpublication presents a special problem when an unpublished opinion contains a concurring or dissenting opinion." Id.* (emphasis added).

> Two major factors argue for publication in cases that generate separate opinions. First are the stated premises of limited publication, which is a treatment supposedly reserved for cases that do not implicate the law making function of the court—routine, uncontroversial cases. Cases that contain dissents or concurrences are, by definition, controversial; the court disagrees either about the result to be reached or about the method used to reach it. Accordingly, *few decisions with separate opinions should go unpublished.*

*Id.* (emphasis added).

The second factor supporting the argument that separate opinions should be published "is the role played by the separate opinion in our judicial system." *Id.* The separate opinion assures

> a public airing of a contrary view of the same facts and law. The separate opinion also performs an important corrective function, for it criticizes the result and reasoning of the ma-

jority, appealing for correction by a higher court, a future court, or a legislature. It is "an appeal to the brooding spirit of the law, to the intelligence of a later day."

*Id.* Moreover, *"the dissent is an assurance that the case was fully considered and thoroughly argued by the bench as a whole and was not merely adopted as written by one member."* Fuld, *The Voices of Dissent*, 62 Colum. L.Rev. 923, 927 (1962) (emphasis added).

Another reason to publish those decisions in which there are separate decisions is to ensure that the majority does not suppress the views of a dissenting judge. As noted by the researchers in *The Price of Reform*, while "[w]e are not aware of any federal cases where that has occurred[,], [t]he problem has arisen in some state cases." *Id.* at 613 n. 15. Judge Jefferson's experience in a California Court of Appeals case, *People v. Para*, No. CRA 15889 (Cal.Ct.App. Aug. 1979), is instructive:

> Initially, it appeared that the majority felt the same as I do regarding the fact that the majority opinion merited publication in the Official Reports. When circulated to me, the majority opinion was approved by the two justices making up the majority and was marked for publication in the Official Reports. It was only after I had circulated my dissenting opinion to the two justices who make up the majority that they decided to reverse their original position regarding publication in the Official Reports. I do not think this reversal of position is justified.

*Id.* (quoting *Para*, No. CRA 15889, slip op. at 34 (Jefferson, J., dissenting)).

While I understand that unpublished opinions are sometimes justified as a remedy for avoiding backlogs, the question is one of appropriate balance in view of our role as the court of last resort and the long-term perspective we must take. Not every opinion need be published, but *an abundance of unpublished work inevitably does nothing for the furtherance of justice, or, ultimately, the reduction of future backlog.*

in calculating the thirty-day period in which he must file his appeal, rather than that of the amended, or original judgments. Applying the "material and substantial" test, the majority opinion concludes that, because the Second Amended Judgment was "clerical in nature" and did not "materially alter any rights or obligations," majority opinion at 419, 49 P.3d at 385, the appeal of Poe, a *pro se* appellant, is precluded from judicial review. However, the plain language of our rules does not support such a test, nor does it provide any hint of this newly imposed rule which bars Poe's appeal.

## II.

### A.

Nothing in the rules instructs as to when a notice of appeal from an amended judgment should run. Hawai'i Rules of Civil Procedure (HRCP) Rule 54 indicates a " '[j]udgment' " as used in these rules *includes a decree and any order from which an appeal lies*." (Emphasis added.) "The filing of the judgment in the office of the clerk constitutes the entry of the judgment; and the judgment is not effective before such entry." HRCP Rule 58.

This court's appellate rules similarly do not support a distinction between amendments based on "clerical errors" versus a "material[ ] alter[ation of] rights or obligations[,]" majority opinion at 419, 49 P.3d at 385, as a standard for amended judgments. HRAP Rule 4(a) provides that, "[w]hen a civil appeal is permitted by law, the notice of appeal shall be filed within 30 days *after the entry of the judgment or appealable order*." (Emphasis added.) HRAP Rule 4(a)(5) states that "*[a] judgment or order is entered when it is filed in the office of the clerk of the court*." (Emphasis added.) No reference at all is made to an amended judgment in the rules. Ha-

wai'i Revised Statutes (HRS) § 641–1(a) (1993), to the same effect, is similarly silent.[2] It provides that judicial review is available from "final judgments." *Id.*

### B.

It is evident, then, that nothing in HRS § 641–1(a) or the court rules prohibits this court from regarding an amended judgment as the document from which an appeal lies. The plain meaning of "amendment" is "[t]o change or modify for the better[; t]o alter by modification, deletion, or addition." *Black's Law Dictionary* 81 (6th ed.1990). The connotation of a judgment which is "amended" is that the amended, and not the original judgment, represents the final version of the judgment from which an appeal would be taken. A contrary interpretation would be at odds with the plain meaning of the words "amended judgment"[3] and would run counter to the normal and ordinary expectations of the parties.

### III.

### A.

The majority opinion cites *Korsak v. Hawai'i Permanente Med. Group, Inc.*, 94 Hawai'i 297, 12 P.3d 1238 (2000), and inaccurately asserts that its rule is "applicable to this case[,]" and that the *Korsak* rule was "adopted ... as a guide in determining whether an amendment of an order or judgment affects the time *for appeal*." Majority opinion at 418, 419, 49 P.3d at 384, 385 (emphasis added). However, *Korsak* involved review of an application for *a writ of certiorari of one of the parties there, not an appeal*. Specifically, in *Korsak*, this court construed HRS § 602–59(a) (1993) which provides that "[a]n application for writ of certiorari may be filed with the supreme

---

**2.** HRS § 641–1 states:

(a) Appeals shall be allowed in civil matters from all final judgments, orders, or decrees of circuit and district courts and the land court, to the supreme court or to the intermediate appellate court, except as otherwise provided by law and subject to the authority of the intermediate appellate court to certify reassignment of a matter directly to the supreme court and subject to the authority of the su-

preme court to reassign a matter to itself from the intermediate appellate court.

**3.** The interpretation of a rule promulgated by the courts involves principles of statutory construction. *See Keaulii v. Simpson*, 74 Haw. 417, 421, 847 P.2d 663, 666, *reconsideration denied*, 74 Haw. 650, 847 P.2d 263, *cert. denied*, 510 U.S. 814, 114 S.Ct. 61, 126 L.Ed.2d 31 (1993).

court no later than thirty days after the filing *of the decision* of the intermediate appellate court." [4] (Emphasis added.) The parties had petitioned the supreme court for certiorari pursuant to HRAP Rule 40.1, which governs *only* writs of certiorari to the supreme court from the Intermediate Court of Appeals (ICA).

The *Korsak* court defined the issue before it, stating that "the question before us is whether a sua sponte order amending a denial of reconsideration extends the time within which *an application for certiorari* must be filed." 94 Hawai'i at 304, 12 P.3d at 1245 (emphasis added). Finding that "HRAP Rule 40.1(a), as well as existing Hawai'i case law, is silent on this issue[,]" *id.*, *Korsak* turned to *Interstate Printing Co. v. Department of Revenue*, 236 Neb. 110, 459 N.W.2d 519 (1990), and also quoted *McCarthy v. Jaress*, 6 Haw.App. 143, 146 n. 5, 711 P.2d 1315, 1319 n. 5 (1985), for the proposition that, "[u]nder the HRAP, the date of the filing of the decision, ruling, or opinion is the starting date used in computing the periods for ... seeking certiorari[,]" *Korsak*, 94 Hawai'i at 304, 12 P.3d at 1245 (quoting *McCarthy, supra* ).

In construing HRAP Rule 40.1(a), the *Korsak* court did not reference HRAP Rule 4 at all, nor cite to any Hawai'i cases in which HRAP Rule 4 was at issue. The narrow holding of that case was that "the entry of the amended order [of the ICA] did not extend the time within which the [petitioner] was required to file *an application for certiorari* under HRS § 602–59(c) and HRAP Rule 40.1(a)." [5] *Korsak*, 94 Hawai'i at 304–05, 12 P.3d at 1245–46 (emphasis added).

To the extent *Korsak* is followed, it should be relegated to the question it posed and to its specific factual situation. *See id.* at 304, 12 P.3d at 1245. To reiterate, HRAP Rule 4 was not in issue in *Korsak*. Obviously, the

consequences attending the decision in this case are far more egregious. At the least in *Korsak*, the appeal was heard by the ICA. The application of the *Korsak* decision to this case forecloses any appeal at all.

Moreover, the *Korsak* opinion cites a line of cases in which the issue was whether amended judgments entered *nunc pro tunc*, explicitly relating the date of the amended judgment back to the date of the original judgment, extended the time of filing an appeal. *See id.* at 304, 12 P.3d at 1245. In *Korsak*, this court relied primarily upon *Interstate*, a case that is unique on its facts. In essence, in that case, Interstate Printing Company appealed a decision of the tax commission to the district court. *See Interstate*, 459 N.W.2d at 521–22. The district court affirmed the tax commission's decision. *See id.* Thereafter, Interstate moved the district court *for an order nunc pro tunc* requesting correction of the district court's order affirming the decision of the tax commission. *See id.* at 522. In response to the motion, the district court entered a minute entry amending its order. *See id.*

Interstate's appeal was filed in excess of the thirty-day period for appealing from the order affirming the tax commission's decision. *See id.* On appeal, however, the Nebraska Supreme Court, addressing the issue of what was and was not correctable by an order *nunc pro tunc*, indicated that, because the modification was not for a clerical error but was for a "judicial error," the correction could not be made *nunc pro tunc*. *Id.* at 523. The court accordingly treated the date of the attempted *nunc pro tunc* order as the date from which the appeal should be measured, and deemed the appeal valid. *See id.*

Here, unlike in *Interstate*, no cautionary *nunc pro tunc* proviso was made for the amended judgment. Here, unlike in *Inter-*

---

4. *Cf.* HRS § 641–1(c) which governs appeals from civil judgments to the supreme court ("An appeal shall be taken in the manner and *within the time provided by the rules of court.*" (Emphasis added.))

5. Amended appellate judgments and amended lower court judgments are not analogous. At the appellate level, the "judgment is [normally] the final act with respect to the merits of the case on

appeal." *McCarthy v. Jaress*, 6 Haw.App. 143, 146 n. 5, 711 P.2d 1315, 1318 n. 5 (1985) (discussing the bright-line rule HRAP has adopted for termination of appellate jurisdiction). A trial court's jurisdiction, however, does not automatically terminate upon entry of judgment. A trial court may entertain motions after judgment has been entered.

*state*, the appellant calculating the time for appeal could not look at the face of the judgment and see language warning him that the correction or amendment related back to an earlier judgment.

### B.

Obviously, a *nunc pro tunc* order relates back to the original date of the matter it affects. *See Black's Law Dictionary* at 1069 (defining *"nunc pro tunc"* as "acts allowed to be done after the time when they should be done, with a retroactive effect").[6] But an amended judgment that is not entered *nunc pro tunc* or pursuant to a *nunc pro tunc* motion gives no notice to the parties that a correction is intended to relate back to the date of the original judgment.

Likewise, in this case, the amended judgment gives no notice to Poe that it should relate back to the original judgment and was not the intended "final" judgment appealable under HRAP Rule 4. Accordingly, the time for appeal should run from entry of the amended judgment from which Poe appealed. *Cf. Fredonia State Bank v. General Am. Life Ins. Co.*, 884 S.W.2d 167, 180 (Tex.App.1992)

---

**6.** An order *nunc pro tunc* relates back to the original date of judgment, *see Black's Law Dictionary* at 1069, and may be entered to correct a clerical error or correct a clerical mistake in order to make the judgment conform. "The Latin Phrase, 'nunc pro tunc' is merely descriptive of the inherent power of a court to make its records speak the truth, *i.e.*, to record that which ... actually [occurred]," but was erroneously omitted or recorded. *Simmons v. Atlantic Coast Line RR Co.*, 235 F.Supp. 325, 330 (D.S.C.1964). Hawai'i courts have the inherent power to amend their records to correspond to the actual facts, *i.e.*, correct a clerical error. *See, e.g., City and County of Honolulu v. Caetano*, 30 Haw. 1 (1927); *Wong v. Wong*, 79 Hawai'i 26, 29, 897 P.2d 953, 956 (1995).

To relate the order back to the original date, the court must specify the *nunc pro tunc* effect of the amending order. *See, e.g., Farrow v. Dynasty Metal Sys., Inc.*, 89 Hawai'i 310, 312, 972 P.2d 725, 727 (App.1999) ("IT IS FURTHER ORDERED that an Amended Judgment reflecting the correct name of Defendant DYNASTY METAL SYSTEMS, INC., nunc pro tunc to the effective date of the Judgment, be prepared by Plaintiff's counsel."). The general rule is that an order *nunc pro tunc* does not extend time for filing a notice of appeal. *See, e.g., Gonzalez v. Doctors Hospital—East Loop*, 814 S.W.2d 536, 537 (Tex.App. Houston 1st Dist.1991) (determin-

---

(stating that, based on Texas Rules of Civil Procedure Rule 329(b)(h) (2001),[7] "[a]ny change, whether or not material or substantial, made in a judgment while the trial court retains plenary power" during the 30 days after judgment before an appellate court would acquire jurisdiction, "operates to delay the commencement of the appellate timetable until the date the modified, corrected, or reformed judgment is signed"), *rev'd on other grounds*, 881 S.W.2d 279 (Tex.1994).

### IV.

Further, not only does the face of the judgment lack cautionary language, but, until today, our case law similarly lacked this warning. To further support the *Korsak* certiorari standard, the majority cites to a number of cases utilizing this rule, including *Fed. Trade Comm'n v. Minneapolis–Honeywell Regulator Co.*, 344 U.S. 206, 73 S.Ct. 245, 97 L.Ed. 245 (1952). *See* majority opinion at 418–419, 49 P.3d at 384–385. In a dissent to that decision, Justice Black discussed the arbitrary nature of the majority's test for "finality" of the first judgment, stating

---

ing that a *nunc pro tunc* order correcting the name of a party did not expand the time to file an appeal); *Faddis v. Woodward Iron Co.*, 276 Ala. 283, 161 So.2d 486, 488 (1964) ("We think it well settled from the cases that where a judgment even though defective, has been entered by the court, and a motion is made to amend said judgment nunc pro tunc to correct clerical errors, the corrected judgment relates back to the defective judgment, that is, the date it was originally entered and the time for taking an appeal, and we perceive review by writ of certiorari under the compensation statutes dates from the date of the original judgment." (Citation omitted.)).

However, amended orders without the cautionary *nunc pro tunc* language are not uniformly held to relate back to the original date of judgment.

**7.** Tex.R. Civ. P. Rule 329(b)(h) states:

If a judgment is modified, corrected or reformed in any respect, the time for appeal shall run from the time the modified, corrected, or reformed judgment is signed, but if a correction is made pursuant to Rule 316 after expiration of the period of plenary power provided by this rule, no complaint shall be heard on appeal that could have been presented in an appeal from the original judgment.

I think that no statute, precedent or reason relied on by the Court requires dismissal of this cause. Of course appealability of a judgment depends on its being "final" in the legalistic sense. But there is no more ambiguous word in all the legal lexicon. The Court of Appeals thought its second not its first decree was "final." Counsel for the Commission evidently believed the second judgment was the "final" one. I am confident many lawyers would have thought the same thing under this Court's former cases.... *But in arguing over "finality" we should not ignore the fact that Congress has declared that this type of proceeding should be reviewable both in the Court of Appeals and here. We frustrate that declaration when review is denied a litigant because of his failure to guess right when confronted in August 1951 with a puzzle, the answer to which no one could know until today.*

*Id.* at 215–17, 73 S.Ct. 245 (Black, J., dissenting). Similarly here, the majority is requiring Poe to have "guess[ed] right[,]" *id.* at 217, 73 S.Ct. 245, *when, prior to today, he could not have known the answer.*

## V.

### A.

As previously indicated, adoption of a material alteration test, in place of requiring a court to enter an amended judgment *nunc pro tunc*, if that is the intended effect, produces ambiguity as to whether an amendment qualifies under the test and, hence, unjustly places the burden of making the correct ad hoc determination as to that question upon appellants. The effect of the test is especially egregious in light of the rule that, "as a general proposition, ... where a judgment, order, or decree is amended or modified, *the time within which an appeal from such determination may be taken begins to run from the date of the amendment or modification.*" C.S. Patrinelis, Annotation, *Amendment of Judgment as Affecting*

*Time for Taking or Prosecuting Appellate Review Proceedings,* 21 A.L.R.2d 285, 287 (1965) (emphasis added). "[M]any courts have added the qualification that the amendment or modification must be a substantial or material one, and not the mere correction of a clerical or formal error in the original judgment." *Id.* However, as one would expect, there are multifarious outcomes depending upon what is considered a "material change." *See id.* at 295–302. In the absence of a *nunc pro tunc* entry, treating the time for appeal as running from the date of an amended judgment[8] would avoid the injustice flowing from an appellant's misapprehension, subject, as it is, to a postfactum determination as to whether an amendment to the judgment was a sufficiently "material" one or not.

### B.

Extending the *Korsak* certiorari standard to appeals from our trial courts means that the time for appeal now must be measured from the entry of an amended judgment and that we must, subsequent to the filing of the appeal, decide whether such a judgment does or does not reflect a "material[ ] alter[ation to] any rights or obligations[,]" *see* majority opinion at 419, 49 P.3d at 385, *i.e.,* " 'if the amendment of a final judgment or decree for the purpose of correcting a "clerical error" either materially alters rights or obligations determined by the prior judgment [or decree] or creates a right of appeal where one did not exist before.' " *Korsak,* 94 Hawai'i at 304, 12 P.3d at 1245 (quoting *Interstate,* 459 N.W.2d at 522–23).

But this requires an appealing party to ascertain the effect of the amendment to the judgment on the rights and obligations of the parties, and whether that change is sufficiently "material," an issue that may later be subject to dispute, placing a party at great risk of an adverse postfactum determination. The application of the material alteration standard creates traps for parties, particu-

---

8. While, in most instances, a judgment will be amended but once, conceivably a judgment may be amended more than once, as was the case here. It would be unjust, for the reasons recounted herein, to reject the appeal of a party who appealed from one of the amended judgments later determined by an appellate court as not having incorporated a substantial and material change.

larly *pro se* appellants. This seems especially so where, as here, the trial court sua sponte amended the judgment. By contrast, applying the most reasonable and basic understanding of what the words "amended judgment" mean would best comport with maintaining reasonable access to the courts, fairness to the parties, and our role as the court of last resort in this state. *Cf. Setala v. J.C. Penney Co.*, 97 Hawai'i 484, 488, 40 P.3d 886, 890 (2002) ("[U]nder our constitution, every person is guaranteed the equal protection of the laws and equal access to the courts.").

## VI.

Accordingly, for the reasons discussed *supra*, and in light of the precedent it sets, I must strongly disagree with the dismissal of Poe's appeal.