214 P.3d 598

ESTATE OF Roger ROXAS; and the Golden Budha Corporation, a foreign corporation, Petitioners/Plaintiffs–Appellees,

v.

Imelda MARCOS, Respondent/Defendant–Appellant,

and

Ferdinand MARCOS, Defendant.

No. 28702.

Supreme Court of Hawai'i.

Aug. 10, 2009.

Brian R. Magana, pro hac vice, (Daniel C. Cathcart, pro hac vice, of Magana, Cathcart & McCarthy, Los Angeles, CA, and Ward D. Jones of Bervar & Jones, Honolulu, with him on the application and briefs) for petitioners/plaintiffs-appellees.

Joseph A. Stewart (Lex R. Smith and Maria Y. Wang of Kobayashi, Sugita & Goda, Honolulu, and James P. Linn, Oklahoma City, OK, and D. Patrick Long, Dallas, TX (special counsel to the firm) of James P. Linn Law Firm, Oklahoma City, OK, with him on the response and briefs) for respondent/defendant-appellant.

MOON, C.J., NAKAYAMA, and DUFFY, JJ., Circuit Judge DEL ROSARIO, in Place of ACOBA, J., Recused, and Circuit Judge POLLACK, Assigned by Reason of Vacancy.

Opinion of the Court by NAKAYAMA, J.

Petitioners/Plaintiffs–Appellees The Estate of Roger Roxas and The Golden Budha Corporation ("GBC") (collectively, "Petitioners") petition this court to review the Intermediate Court of Appeals' ("ICA's") March 5, 2009 judgment on appeal. The ICA's judgment was entered pursuant to its February 12, 2009 published opinion,[1] *Estate of Roxas v. Marcos* ("*Roxas II* "), 120 Hawai'i 123, 126, 202 P.3d 584, 587 (App.2009), which reversed the first circuit court's ("circuit court's")[2] July 24, 2007 order granting Petitioners' two May 8, 2007 motions to extend the second and fourth amended judgments. The ICA held that the circuit court erred in extending the Plaintiffs' second and fourth amended judgments because, under Hawai'i Revised Statute ("HRS") § 657–5 (2006),[3] "the August 28, 1996 [j]udgment is the 'original judgment' for purposes of this case and the limitation period for an extension commenced on its August 28, 1996 entry date." *Roxas II*, 120 Hawai'i at 126, 202 P.3d at 587. We accepted Petitioners' application for a writ of certiorari, and oral argument was held on June 4, 2009.

Petitioners assert that the ICA gravely erred by interpreting "original judgment" of HRS § 657–5 as the "first judgment rendered by a court." *Id.* at 126, 202 P.3d at 587. They argue that this construction creates "an unreasonable result in cases in which more than one judgment is entered between different parties or as to different claims." Petitioners maintain that the limitations period on extending a judgment is ten years from the date that the judgment to be extended was first entered.

We hold that the "original judgment" of HRS § 657–5 refers to the judgment that creates the rights and responsibilities seeking to be extended, and, therefore, the circuit court did not err in extending the second and fourth amended judgments. Nevertheless, the circuit court erred when it extended the fourth amended judgment until September 5, 2021, because that date is beyond twenty years of the "original judgment," entered on June 26, 2000. Accordingly, we (1) vacate the ICA's March 5, 2009 judgment, (2) vacate the circuit court's July 24, 2007 order, to the extent that it granted Petitioners' motion to extend the fourth amended judgment until September 5, 2021, and (3) remand this case to the circuit court for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual History

On January 24, 1971, Roger Roxas ("Roxas") discovered the legendary "Yamashita Treasure," which, among other things, consisted of a gold-colored buddha statue and bars of gold. *Roxas v. Marcos* ("*Roxas I* "), 89 Hawai'i 91, 100–1, 969 P.2d 1209, 1218–19

---

1. The opinion was authored by Associate Judge Daniel R. Foley, with Associate Judge Katherine G. Leonard concurring separately. Associate Judge Craig H. Nakamura wrote a dissenting opinion.

2. The Honorable Karen S.S. Ahn presided.

3. HRS § 657–5 provides:

   Unless an extension is granted, every judgment and decree of any court of the State shall be presumed to be paid and discharged at the expiration of ten years after the judgment or decree was rendered. No action shall be commenced after the expiration of ten years from the date a judgment or decree was rendered or extended. *No extension of a judgment or decree shall be granted unless the extension is sought within ten years of the date the original judgment or decree was rendered.* A court shall not extend any judgment or decree beyond twenty years from the date of the original judgment or decree. No extension shall be granted without notice and the filing of a non-hearing motion or a hearing motion to extend the life of the judgment or decree.
   (Emphasis added.)

(1998).[4] Subsequently, on April 5, 1971, under the direction of Ferdinand Marcos, individuals claiming to be from two Philippine national security agencies, knocked on Roxas's door, claiming to have a search warrant for his house. *Id.* at 102, 969 P.2d at 1220. The men broke Roxas's windows, pointed the barrels of their rifles inside, and threatened to shoot him if he did not open the door. *Id.* Roxas opened the door, and the men beat Roxas's brother and ordered his family and two bodyguards to lie down on the floor. *Id.* The men stole the buddha, the diamonds, seventeen bars of gold, samurai swords, a piggy bank belonging to Roxas's children, and his wife's coin collection. *Id.*

Subsequently, on May 18, 1971, Roxas was arrested and tortured for information about his treasure. *Id.* at 103, 969 P.2d at 1221. He was kept in a room for two weeks, and he was forced to sign an affidavit declaring that the raid in his house had been performed "in a peaceful manner." *Id.* Roxas eventually escaped. *Id.*

In late 1974, Ferdinand Marcos and his aides and generals, as well as Imelda Marcos' personal security, sought the services of Robert Curtis, an American who owned a mining company. *Id.* at 105–06, 969 P.2d at 1223–24. They asked Curtis to resmelt gold bars that Ferdinand Marcos claimed were from the Yamashita Treasure. *Id.* Curtis testified that he entered a room " 'about roughly 40 by 40,' stacked to the ceiling with bars of gold," and also saw the solid gold buddha statue that Roxas had discovered. *Id.*

On June 3, 1986, Roxas assigned all of his rights to the Yamashita Treasure to GBC, in exchange for a minority holding of non-voting shares. *Id.* at 107, 969 P.2d at 1225.

## B. Judgment And Amended Judgment

On February 19, 1988, Roxas and GBC filed a lawsuit against Ferdinand and Imelda Marcos. *Id.* at 109, 969 P.2d at 1227. Roxas asserted claims of false imprisonment and battery against Ferdinand Marcos. *Id.* GBC asserted claims against Ferdinand and

Imelda Marcos for conversion, constructive trust, and fraudulent conveyances. *Id.*

During the litigation, on September 29, 1989, Ferdinand Marcos died, and the parties subsequently stipulated to substitute Imelda Marcos as his estate's personal representative. *Id.* In 1993, during the litigation, Roxas also died, and the circuit court granted a motion to substitute Felix Dacanay ("Dacanay"), personal representative of the Roxas Estate, for Roxas as a party plaintiff. *Id.*

Pursuant to a July 19, 1996 jury verdict, the circuit court filed a judgment on August 28, 1996 ("first-in-time judgment") (1) in favor of Dacanay, as personal representative of the Estate of Roger Roxas and *against Ferdinand Marcos* on the battery and false imprisonment claims, (2) in favor of GBC and *against Ferdinand Marcos* on the conversion claim, and (3) in favor of Imelda Marcos, in her individual capacity, and against Petitioners on all claims they asserted against her. *Id.* at 114, 969 P.2d at 1232.

The circuit court filed an amended judgment on October 21, 1996 ("Amended Judgment"), pursuant to Petitioners' request to correct the first-in-time judgment by "add[ing] the 'Estate of Ferdinand Marcos' as a proper party defendant." *Id.* at 114–15, 969 P.2d at 1232–33. Pursuant to the circuit court's prior substitution of Imelda Marcos as a representative for the Estate of Ferdinand Marcos, the court filed an Amended Judgment against "Defendant Imelda Marcos, as Personal Representative of the Estate of Ferdinand Marcos," (1) in favor of Dacanay, as personal representative of the Estate of Roger Roxas, in the amount of $6 million in damages for battery and false imprisonment, and (2) in favor of GBC, in the amount of over $22 billion for conversion.

## C. The 1998 *Roxas I* Decision

Imelda Marcos, "in her alleged capacity as personal representative of the Marcos Estate," appealed from the Amended Judgment, arguing that the court erred by amending the judgment against her as "personal representative" of the Marcos Estate,

---

4. *Roxas I* provides a more detailed description of the background facts established at trial. *See* *Roxas I,* 89 Hawai'i at 100–109, 969 P.2d at 1218–1227.

where she was substituted as "the representative of Defendant Ferdinand Marcos deceased." *Id.* at 99, 117, 969 P.2d at 1217, 1235. Petitioners cross-appealed. *Id.* at 99, 969 P.2d at 1217.

This court issued *Roxas I* on November 17, 1998, affirming, reversing, and vacating and remanding parts of the Amended Judgment. *Id.* at 157, 969 P.2d at 1275. We held, among other things, that generally, "an heir of an undistributed estate, who has not been judicially appointed as the personal representative of a decedent's estate, is not a 'proper party' for substitution pursuant to [Hawai'i Rules of Civil Procedure ("HRCP")] Rule 25(a)(1)." *Id.* at 122, 969 P.2d at 1240. We noted that Petitioners did not establish that Imelda Marcos was appointed as the personal representative of the Marcos Estate, and, therefore, Imelda Marcos did not bind the Marcos Estate to the judgment. *Id.* at 122 n. 18, 126, 969 P.2d at 1240 n. 18, 1244. We ruled, however, that Imelda Marcos deceived the court into permitting her to represent Ferdinand Marcos, and, that

in order to achieve justice consistent with the doctrine of judicial estoppel, the equities of this case require us to hold *Imelda [Marcos] personally liable, at least to the extent of her interest in the assets of the Marcos Estate*, for the amount of the plaintiffs-appellees' judgment against Ferdinand [Marcos], as that amount has been modified according to this opinion.

*Id.* at 126, 969 P.2d at 1244 (emphasis added). We vacated the portion of the circuit court's Amended Judgment entered against "Defendant Imelda Marcos, as Personal Representative of the Estate of Ferdinand Marcos" with respect to the [Petitioners'] battery, false imprisonment, and conversion claims, and remanded for entry of judgment as to those claims against "Imelda [Marcos], in her personal capacity, to the extent of her interest in the Marcos Estate." *Id.* at 126–27, 969 P.2d at 1244–45.

Further, *Roxas I* (1) reversed that part of the Amended Judgment awarding GBC $22 billion for one storage area of gold bullion, (2) vacated the portion of the Amended Judgment awarding GBC $1.4 million in damages for conversion of the golden buddha statue and the seventeen gold bars, and entering judgment in favor of Imelda Marcos and against Petitioners on GBC's claim for constructive trust, and (3) remanded for

([a]) a new trial on the value of the converted golden buddha statue and seventeen gold bars, ([b]) an award of prejudgment interest on the damages awarded as a consequence of the conversion of the golden buddha and seventeen gold bars, commencing from the date corresponding to the value of the gold assigned by the jury, and ([c]) further proceedings, to the extent necessary, on GBC's equitable claim against Imelda, in her personal capacity, for constructive trust.

*Id.* at 157, 969 P.2d at 1275.

### D. Second, Third, And Fourth Amended Judgments

On October 18, 1999, the circuit court filed a second amended judgment ("Second Amended Judgment") pursuant to *Roxas I*. In pertinent part, the Second Amended Judgment granted judgment "in favor of [Dacanay,] as personal representative of the estate of Roger Roxas in the amount of $6 million in general damages for false imprisonment and battery against Imelda Marcos in her personal capacity, to the extent of her interest in the Marcos Estate." It also stated that the "judgment is entered *nunc pro tunc* as of October 21, 1996," the date of the Amended Judgment.

On February 28, 2000, the circuit court held a bench trial on the issue of damages for conversion. The court filed a third amended judgment ("Third Amended Judgment") on June 26, 2000, amending the Second Amended Judgment's sixth paragraph stating that the court retained jurisdiction over GBC's conversion claims. The Third Amended Judgment awarded GBC over $13 million in damages and pre-judgment interest (calculated from the highest value of gold until the date of the Amended Judgment) against "Imelda Marcos in her personal capacity, to the extent of her interest in the Marcos Estate," for conversion of the gold buddha and seventeen small bars of gold. The Third Amended Judgment was entered *nunc pro tunc* as of

October 21, 1996, the date of the Amended Judgment.

The parties appealed the Third Amended Judgment to this court, but the appeal and cross-appeal were dismissed for lack of jurisdiction. In an order dated March 21, 2001, we ruled that the Third Amended Judgment

did not meet the certification requirements of HRCP [Rule] 54(b) and the judgment is not an appealable final judgment on the claim for conversion. *See* HRCP [Rule] 54(b) ("[T]he court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon direction for the entry of a judgment.").

Further, we noted that the Amended Judgment's certification was "effective only as to those claims certified as final on October 21, 1996 and not to claims subsequently decided by the [Second and Third Amended Judgments], even though those judgments were entered *nunc pro tunc* to October 21, 1996."

The circuit court filed a fourth amended judgment ("Fourth Amended Judgment") on September 6, 2001, which amended the Third Amended Judgment by stating: "The court expressly determines that there is no just reason for delay and expressly directs for the entry of judgment. This judgment was also entered *nunc pro tunc* as of October 21, 1996," the date of the Amended Judgment. All parties appealed from the Fourth Amended Judgment. In a summary disposition order dated November 30, 2005, this court affirmed the Fourth Amended Judgment.

## E. Motions To Extend Second and Fourth Amended Judgments

On May 8, 2007, Petitioners filed motions to extend the Second Amended Judgment (filed on October 18, 1999) and Fourth Amended Judgment (filed on September 6, 2001) for an additional ten-year period. Imelda Marcos objected, arguing that an extension was precluded under HRS § 657–5, which requires that the extension "is sought within ten years of the date the original judgment or decree was rendered." She asserted that the "original judgment" was rendered in 1996, and that, therefore, the subject motions, filed more than ten years after that date, on May 8, 2007, were untimely. In response, Petitioners argued that the 1996 judgment ceased to exist due to *Roxas I* vacating the Amended Judgment and remanding the case. Moreover, they pointed out that the Second and Fourth Amended Judgments are against a "new and different party defendant" from the first-in-time judgment.

On July 24, 2007, the circuit court granted Petitioners' motions to extend the Second and Fourth Amended Judgments. The court ruled that "[a] vacation or reversal extinguishes a judgment," and noted that *Roxas I* reversed, affirmed, vacated, and remanded differing portions of the first-in-time judgment. Furthermore, the court stated that HRS § 657–5's term "original judgment" is "plain and unambiguous" and "reflect[s] the legislature's intent to distinguish within [HRS] § 657–5 a judgment which has been extended from an initial judgment and thus make clear that a [s]tate [c]ourt judgment may enjoy but one extension." The court ruled that the "entry of final judgment should mark the beginning of the limitations period," and, therefore, Petitioners' ten-year period to extend the judgments had not expired. The court ordered that the Second Amended Judgment (filed on October 18, 1999) extend until October 17, 2019, and that the Fourth Amended Judgment (filed on September 6, 2001) extend until September 5, 2021.

On August 22, 2007, Imelda Marcos filed a timely notice of appeal.

## F. *Roxas II* Reversing The Circuit Court's Order

On appeal, Imelda Marcos argued that the "original judgment" was rendered in 1996, and that, under HRS § 657–5, Petitioners' May 8, 2007 motions to extend the Second and Fourth Judgments were untimely. Imelda Marcos contended that "original judgment" does not mean "final judgment after appeal," or "amended judgment," inasmuch as "original" refers to the "first stage of existence" or "the first form." Finally, she contended that the motions were untimely

because, even if the Second and Fourth Amended Judgments were the starting point for extending the judgments, they were entered *nunc pro tunc* "as of October 21, 1996," and "relate[d] back to October 21, 1996, 'as if the judgment[s] had been rendered on that date.'" (Quoting *Keahole Defense Coalition, Inc. v. Board of Land and Natural Resources*, 110 Hawaiʻi 419, 431, 134 P.3d 585, 597 (2006).)

Petitioners, on the other hand, argued that under HRS § 657-5, the "ten-year statute of limitations on judgments[ ] can be extended for an additional ten years if application for an extension is made before the original ten years has run." Because *Roxas I* vacated the Amended Judgment (filed in 1996), the Amended Judgment "is no longer a valid and existing judgment." Accordingly, they argued, their motions to extend the Second and Fourth Amended Judgments (entered on October 1, 1999 and September 6, 2001), which were filed within ten years of those judgments, were timely. Moreover, they contended that the fact that the amended judgments were entered *nunc pro tunc* "has no effect on when the statute of limitations period begins to run," because the judgments were not actually awarded until they were actually filed.

In a February 12, 2009 published opinion, the ICA held that the circuit court erred in extending Petitioners' Second and Fourth Amended Judgments. *Roxas II,* 120 Hawaiʻi at 126–27, 202 P.3d at 587–88. Based on the "ordinary use" of the word "original," the ICA ruled that the "'original judgment' logically refers to the first judgment rendered by a court.'" *Id.* at 126, 202 P.3d at 587. It concluded that "the August 28, 1996 judgment is the 'original judgment' for purposes of this case and the limitation period for an extension commenced on its August 28, 1996 entry date." *Id.* at 126, 202 P.3d at 587. Under this interpretation of HRS § 657-5, Petitioners' motions to extend the Second and Fourth Judgments were untimely and the ICA reversed the circuit court's orders. *Id.* at 127, 202 P.3d at 588.

Associate Judge Katherine G. Leonard wrote a concurring opinion emphasizing that "parties and the courts are best served by the clear, plain understanding that, under HRS § 657-5, the original judgment in any case is the first judgment entered." *Id.* at 128, 202 P.3d at 589 (Leonard, J., concurring). She further asserted that (1) *Roxas I* did not extinguish the first-in-time judgment, (2) the *nunc pro tunc* judgments "shall have the same legal force and effect" as if done at the 1996 date, and (3) extending the life of any final judgment that is amended by, before, or after an appeal would "eliminate the quality or state of originality from the term original judgment." *Id.* at 127–28, 202 P.3d at 588–89 (Leonard, J., concurring).

Associate Judge Craig H. Nakamura dissented, reasoning that, "original judgment" as used in HRS § 657-5 means "the first enforceable judgment that has not been vacated or extinguished." *Id.* at 129, 202 P.3d at 590 (Nakamura, J., dissenting). In his view, *Roxas I* "effectively extinguished the prior judgments entered by the circuit court by changing the party against whom the monetary awards could be enforced." *Id.* Judge Nakamura noted that the Second Amended Judgment was the first judgment entered against Imelda Marcos in a personal capacity, but posited that, because the Second and Third Amended Judgments did not "contain[ ] the certification required by HRCP Rule 54(b) to make a judgment rendered on fewer than all of the claims or parties a final judgment," they were not "enforceable" and thus, not "rendered" under HRS § 657-5. *Id.* at 134, 202 P.3d at 595 (Nakamura, J., dissenting). Judge Nakamura's dissent explained that the original judgment was only rendered when the Fourth Amended Judgment was issued, inasmuch as it satisfied the HRCP Rule 54(b) certification requirements. *Id.* Moreover, Judge Nakamura argued that the entry of the Second, Third, and Fourth Amended Judgments *nunc pro tunc* as of October 21, 1996 "was a 'fiction of law' and did not change the date they actually became enforceable," September 6, 2001. *Id.* at 135, 202 P.3d at 596 (Nakamura, J., dissenting).

The ICA filed a judgment on appeal on March 5, 2009. Petitioners filed an application for a writ of certiorari on March 31,

2009. Imelda Marcos filed a response to the application on April 15, 2009.

## II. STANDARD OF REVIEW

■■■ "The interpretation of a statute is a question of law reviewable *de novo.*" *Capua v. Weyerhaeuser Co.*, 117 Hawai'i 439, 443, 184 P.3d 191, 196 (2008) (citing *Flor v. Holguin*, 94 Hawai'i 70, 76, 9 P.3d 382, 388 (2000)) (brackets, citations, and ellipses omitted). Statutory construction is guided by the following rules:

First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

*Carlisle v. One (1) Boat*, 119 Hawai'i 245, 256, 195 P.3d 1177, 1188 (2008) (quoting *In re Contested Case Hearing on Water Use Permit Application*, 116 Hawai'i 481, 489–90, 174 P.3d 320, 328–29 (2007)) (block quotation format altered).

## III. DISCUSSION

### A. Plain Language of HRS § 657–5

HRS § 657–5 is a "[statute of limitations] that applies to actions seeking enforcement of domestic judgments and decrees." *Brooks v. Minn*, 73 Haw. 566, 575, 836 P.2d 1081, 1086 (1992) (referring to HRS § 657–5

5. In 1985, HRS § 657–5 stated:
Every judgment and decree of any court of record of the State shall be presumed to be paid and discharged at the expiration of ten

(1985)).[5] The issue in this case, determining whether the ICA gravely erred by reversing the trial court's order granting Petitioners' motions to extend the Second and Fourth Amended Judgments, depends on when the limitations on the extension of these judgments began to run.

In interpreting HRS § 657–5, we first look to the language of the statute. *See One (1) Boat*, 119 Hawai'i at 256, 195 P.3d at 1188 (citation omitted). HRS § 657–5 provides:

Unless an extension is granted, every judgment and decree of any court of the State shall be presumed to be paid and discharged at the expiration of ten years after the judgment or decree was rendered. No action shall be commenced after the expiration of ten years from the date a judgment or decree was rendered or extended. *No extension of a judgment or decree shall be granted unless the extension is sought within ten years of the date the original judgment or decree was rendered.* A court shall not extend any judgment or decree beyond twenty years from the date of the original judgment or decree. No extension shall be granted without notice and the filing of a non-hearing motion or a hearing motion to extend the life of the judgment or decree.

(Emphasis added.) Although the statute precludes a court from extending a judgment where the extension is sought more than ten years after "the original judgment ... was rendered," the term "original judgment" is not entirely clear.

■■■ As we have explained, when a "term is not statutorily defined, this court may resort to legal or other well accepted dictionaries as one way to determine its ordinary meaning." *Gillan v. Gov't Employees Ins. Co.*, 119 Hawai'i 109, 115, 194 P.3d 1071, 1077 (2008) (citations, brackets, and internal quotation marks omitted). Accordingly, the ICA looked to the dictionary definition of "original" and ruled that " 'original judgment' logically refers to the first judgment rendered by a court." *Roxas II*, 120 Hawai'i at 126,

years after the judgment or decree was rendered, and no action shall be commenced thereon after the expiration of ten years after the judgment or decree was rendered.

202 P.3d at 587 (citing Webster's Encyclopedic Unabridged Dictionary of the English Language 1015 (1989)).

Ruling that a motion to extend any judgment must be filed within ten years of the date of the first-in-time judgment would provide substantially more rights to a first-in-time judgment than a subsequent judgment. Under this rule, a first-in-time judgment is valid for ten years and may be extended for an additional ten year period, thus being able to be enforced for a maximum of twenty years. In contrast, a judgment rendered subsequent to the first-in-time judgment would be afforded less than twenty years to enforce the judgment. In fact, a judgment that is rendered ten or more years after the first-in-time judgment could not be extended and would only be enforceable a maximum of ten years.

██ It is true that there is no court rule or constitutional right to extend every judgment. Nevertheless, if we were to construe the "original judgment," as the first-in-time judgment, it would "produce an absurd and unjust result, ... clearly inconsistent with the purposes and policies of the statute." *State v. Lagat,* 97 Hawaiʻi 492, 499, 40 P.3d 894, 901 (2002) (quoting *State v. Villeza,* 85 Hawaiʻi 258, 272–73, 942 P.2d 522, 534–35 (1997)) (block formatting altered). It is well-established that "departure from a literal construction of a statute ʻis justified when such construction would produce an absurd ... result and the literal construction in the particular action is clearly inconsistent with the purposes and policies of the act.' " *Richardson v. City and County of Honolulu,* 76 Hawaiʻi 46, 60, 868 P.2d 1193, 1207 (1994) (quoting *Franks v. City and County of Honolulu,* 74 Haw. 328, 341, 843 P.2d 668, 674 (1993)); *see also* HRS § 1–15 (1993) ("Where the words of a law are ambiguous[,] ... [e]very construction which leads to an absurdity shall be rejected."); *Flores v. Rawlings Co., LLC,* 117 Hawaiʻi 153, 164, 177 P.3d 341, 352 (2008) (" ʻ[T]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality [.]' " (quoting *Beneficial Hawaiʻi, Inc. v. Kida,* 96 Hawaiʻi 289, 309, 30 P.3d 895, 914–

15 (2001)); *State v. Gomes,* 117 Hawaiʻi 218, 232, 177 P.3d 928, 942 (2008) (Nakayama, J., dissenting)) (" ʻ[E]ven where there is no ambiguity, a departure from the literal application of statutory language will be justified if such literal application will lead to absurd consequences[,]' for ʻ[s]tatutory language must be read in the context of the entire statute, and the harm or evil it seeks to prevent must point the way to its construction.' " (quoting *State v. Ogata,* 58 Haw. 514, 518, 572 P.2d 1222, 1225 (1977))).

Holding that the first-in-time judgment controls the statute of limitations for subsequent judgments would produce an absurd result when the first-in-time judgment does not address or resolve any of the claims ruled on by the subsequent judgment. As Petitioners point out, a first-in-time interpretation would mean that the statute of limitations for extending judgments would begin at the date of entry of the first-in-time judgment, even if it is not "in his name," "on his claim," or "against the party against whom he seeks to enforce his own judgment." This would arbitrarily confer more rights on the party that obtained the first-in-time judgment than a party in a subsequent judgment.

In addition, the term "judgment," as used throughout HRS § 657–5, must refer to a *valid* and *enforceable* judgment. Although the statute states that *"every judgment ...* shall be presumed to be paid and discharged at the expiration of ten years after the judgment ... was rendered"* (emphasis added), the presumption that "every judgment" is "paid and discharged" in ten years cannot be made when the judgment is invalid. *See* 2 Abraham Clark Freeman, A Treatise on the Law of Judgments Including All Final Determinations of the Rights of Parties in Actions or Proceedings at Law or in Equity § 1091, at 2268 (Edward W. Tuttle, ed., rev. 5th ed. 1925) ("[I]f the original judgment has been reversed or satisfied, there can be no execution issued pursuant to the revival by scire facias."). Construing "judgment" as a *valid* judgment, therefore, requires that an "original judgment" is a valid judgment. A first-in-time judgment that has been vacated or reversed is no longer valid and therefore cannot be an "original judgment."

Consistent with this construction of "judgment," Petitioners contend that an "original judgment" is simply a valid judgment that has not been extended. According to Petitioners, the statutory use of "original judgment," as opposed to "judgment" in HRS § 657–5, distinguishes an "original judgment" from an extended judgment in order to clarify that an original judgment, but not an extended judgment, may be extended. Pursuant to this interpretation, they contend that a valid judgment may be extended and enforced during the same ten year period. Thus, under Petitioners' interpretation, "original judgment" is not necessarily the first-in-time judgment of a case.

In light of these conflicting interpretations of the term "original judgment," we do not agree with the ICA or the circuit court that the meaning of the term, as it appears in HRS § 657–5, is "plain" or "unambiguous." *See Roxas II,* 120 Hawai'i at 126, 202 P.3d at 587; *cf. Gillan v. Gov't Employees Ins. Co.,* 119 Hawai'i 109, 117, 194 P.3d 1071, 1079 (2008). As we have stated, "[a] statute is ambiguous if it is capable of being understood by reasonably well-informed people in two or more different senses." *Gillan,* 119 Hawai'i at 117, 194 P.3d at 1079 (citations omitted). Our analysis of the plain language of HRS § 657–5 indicates that reasonable minds could differ as to which judgment an "original judgment" refers to, and, as such, we hold that the term is ambiguous. *See id.* (concluding that the term "independent medical examiner" in HRS § 431:10C–308.5(b) (Supp.2002) was ambiguous because it could be interpreted as requiring an actual examination). Inasmuch as "original judgment" is susceptible to two interpretations,[6] we next look to extrinsic aids to assist our interpretation of HRS § 657–5.

## B. Extrinsic Aids

This court has numerous tools to construe an ambiguous statute:

[T]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool. This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning. Laws *in pari materia,* or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.

*In re Water Use Permit Applications,* 94 Hawai'i 97, 144, 9 P.3d 409, 456 (2000) (internal citations, internal quotation marks, brackets, and ellipses omitted; block quote format changed). *See also* HRS § 1–15 ("Where the words of a law are ambiguous[,] . . . [t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.").

The 1992 Hawai'i Legislature amended HRS § 657–5 by inserting the extension provisions at issue. 1992 Haw. Sess. Laws Act 74, § 1 at 110. The amendments prohibited

---

6. Imelda Marcos points to *International Savings & Loan Ass'n v. Wiig,* 82 Hawai'i 197, 921 P.2d 117 (1996), to support her claim that HRS § 657–5 is unambiguous. (Quoting *Wiig* for stating that "the *plain language of HRS § 657–5* clearly mandates. . . . Accordingly, pursuant to the *plain language of HRS § 657–5,* the judgment expired on March 8, 1994—ten years after the original judgment was rendered." (ellipses added).) In *Wiig,* this court considered "whether a garnishment of wages survives the expiration of a ten year statutory limitation pursuant to [HRS § 657–5] on the life of the underlying judgment." 82 Hawai'i at 198, 921 P.2d at 118. The plaintiff did not renew or extend its judgment against the defendant before the ten year period had run, and, thus, plainly expired ten years after the first and only judgment was rendered. *Id.* at 199, 921 P.2d at 119. In *Wiig,* we were concerned with whether the garnishment order "tolled" the life of the judgment beyond the ten year period, whereas Petitioners here do not seek to argue that an order tolled the life of the judgment. *See also Roxas II,* 120 Hawai'i at 126–27, 202 P.3d at 587–88 (explaining that the circuit court erred by relying on *Wiig* in extending the judgment because that case is inapplicable). Because *Wiig* did not analyze the effect of multiple judgments on extending a judgment, it has limited application to this case.

an "extension of a judgment or decree" where (1) the extension was not "sought within ten years of the date the original judgment was rendered," (2) it is "beyond twenty years from the date of the original judgment or decree," and (3) there was no "notice and the filing of a non-hearing motion or a hearing motion to extend the life of the judgment or decree." *Id.* The legislative committee reports on this bill offer limited guidance in interpreting "original judgment." [7]

The most telling statement about the limitation to extend a judgment is from the House Judiciary Committee's report. In passing the bill that became Act 74, this committee stated, "The purpose of this bill is to amend [HRS § ] 657-5, to prohibit a judgment or decree of any court of the State from being extended, renewed, or revived beyond *ten years after the date the judgment or decree was rendered.*" H. Stand. Comm. Rep. No. 543 in 1992 House Journal, at 1036 (emphasis added). This stated purpose of the amendment indicates that the relevant date for extending a judgment is the "date *the judgment or decree was rendered.*" *Id.* (Emphasis added.)

While the legislative intent of this statutory language is not entirely clear, the statute is clearly designed to prohibit a party from seeking to extend a judgment more than ten years after the "original judgment" is rendered. The statute of limitations for extending a judgment begins to run on "the date the original judgment or decree was rendered." HRS § 657-5. This provision is part of the HRS § 657 "Limitation of Actions" chapter. Under HRS § 1-16 (1993): "Laws *in pari materia,* or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another." The sections in this chapter have similar elements and aid in our interpretation of HRS § 657-5. *See State v.*

*Cardus,* 86 Hawai'i 426, 435, 949 P.2d 1047, 1056 (App.1997) (referring to other sexual assault statutes in construing the offense of sexual assault in the second degree because the statute was included in the "series of offenses").

Other statutes of limitations in HRS Chapter 657 begin when the "cause of action accrued." *See* HRS § 657-1(1) (1993) (relating to, among other things, actions to recover debt "founded upon any contract, obligation, or liability"); HRS § 657-4 (1993) (relating to libel or slander); HRS § 657-6 (1993) (relating to causes arising in foreign jurisdictions); HRS § 657-7 (1993) (relating to recovering for damage to persons or property); *see also Kaho'ohanohano v. Dep't of Human Servs.,* 117 Hawai'i 262, 315, 178 P.3d 538, 591 (2008) ("In a negligence action, the claim for relief does not accrue until plaintiff knew or should have known of defendant's negligence."). Black's Law Dictionary 22 (8th ed.2004) defines "accrue" as "[t]o come into existence as an enforceable claim or right." In construing "original judgment" of HRS § 657-5, *in pari materia* within the framework of the entire statutory scheme governing limitations of actions, the statute of limitations for extending a judgment begins to run when the cause of action—the judgment that creates the enforceable claim or right—"come[s] into existence as an enforceable claim or right." All judgments, even those that are modified or amended, become "enforceable claim[s] or right[s]" only when the judgments creating those rights are entered. It is only at the time that the judgment is rendered when the parties are (1) aware of their rights and responsibilities created by the judgment and (2) able to enforce these rights. Accordingly, the statute of limitations for extending a judgment begins to run at the creation of the judgment that creates the rights and responsibilities that the party is seeking to extend.

---

7. The Senate Judiciary committee's report on this bill explained that the committee amended the bill "so that the statute of limitations for extensions is the same for all decrees and judgments." Sen. Stand. Comm. Rep. No. 2480 in 1992 Senate Journal, at 1117. The legislative intent that "all decrees and judgments" have the "same" ten year statute of limitations for extensions is open to two interpretations. The legislature may have intended that each judgment may be extended (1) for the "same" amount of time (ten years from the date that the judgment was entered), or (2) until the "same" date (ten years after the first-in-time judgment).

The foregoing construction comports with other states' statutes that permit a party to bring an action to extend a judgment before that judgment to be extended expires.[8] *See Iliff v. Dustrud,* 107 Cal.App.4th 1201, 1207–08, 132 Cal.Rptr.2d 848, 852–53 (2003); *accord Robbins v. A.B. Goldberg,* 185 P.3d 794, 796 (Colo.2008) ("A revived judgment must be entered within twenty years after the entry of the judgment which it revives." (quoting C.R.C.P. Rule 54)); *Shamrock, Dev., Inc.,* 737 N.W.2d at 376 (observing that a party may move to renew a judgment if it is prior to the judgment's expiration) (citation omitted); *Citizens Sav. and Loan Ass'n v. McDonald,* 191 Or.App. 45, 80 P.3d 532, 535 (2003) (observing that the state statute permits a court to extend a judgment before it expires); *Kroop & Kurland, P.A. v. Lambros,* 118 Md.App. 651, 703 A.2d 1287, 1289 (1998) ("A notice of renewal may be filed by the judgment holder at any time before the expiration of the judgment."); *Hanks v. Rees,* 943 S.W.2d 1, 3–4 (Mo.Ct.App.1997) (noting that the motion to revive a judgment must be filed before the judgment expires).[9] In considering whether the period to renew an amended judgment begins at the date of the first-in-time or amended judgment, the California Court of Appeals held that, based on state law, "any money judgment ... re-

gardless of whether it be a modified or amended judgment, and without regard to finality" may be extended "before the expiration of the 10–year period of enforceability." *Iliff,* 107 Cal.App.4th at 1207–08, 132 Cal. Rptr.2d at 852–53 (citing California Code of Civil Procedure § 683.130[10]).

This construction does not contradict the definition of "original" as provided by the ICA. *See Roxas II,* 120 Hawai'i at 126, 202 P.3d at 587. The ICA posited that, "[i]n its ordinary use, the word 'original' denotes the 'beginning of something, .... a primary form or type from which varieties are derive.'" *See id.* (quoting Webster's Encyclopedic Unabridged Dictionary of the English Language 1015 (1989)). Although it concluded, in reliance of this definition, that "original judgment" "refers to the first judgment rendered by a court," a first-in-time judgment will not always conform with the definition of "original" as supplied by the ICA. *Id.* The first-in-time judgment is not "a primary form or type from which varieties are derived" in certain circumstances. For example, the first-in-time judgment is not a "primary form or type from which varieties are derived" where an issue is not resolved in the first-in-time judgment, but rather, in a subsequent judgment. In addition, the first-in-time judgment may not even "begin[ ]" to

8. Other jurisdictions permit a litigant to revive a judgment even after it has expired. *See Magnum Commc'ns Ltd., v. Samoluk,* 275 Ga.App. 177, 620 S.E.2d 439, 441 (2005); *In re Stoddard,* 248 B.R. 111, 116–17 (Bankr.N.D.Ohio 2000); *Davis Intern., Inc. ex rel. Patel v. Berryman,* 730 So.2d 242, 244 (Ala.Civ.App.1999); *Gardner v. Gardner,* 22 Kan.App.2d 314, 916 P.2d 43, 45 (1996); *First Nat. Bank of Marengo v. Loffelmacher,* 236 Ill.App.3d 690, 177 Ill.Dec. 299, 603 N.E.2d 80, 83–84 (1992).

9. Imelda Marcos pointed to cases that referred to the first-in-time judgment as the "original judgment." (Citing *Poe v. Hawai'i Labor Realtors Board,* 98 Hawai'i 416, 417, 49 P.3d 382, 383 (2002); *Chattem, Inc. v. Bailey,* 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (White, J., dissenting).) *See also Iliff v. Dustrud,* 107 Cal. App.4th 1201, 1206, 132 Cal.Rptr.2d 848, 852 (2003).

However, other courts have referred to the judgment that may be extended as the "original judgment." *See Shamrock Dev., Inc. v. Smith,* 737 N.W.2d 372, 376 (Minn.Ct.App.2007), *reversed on other grounds by* 754 N.W.2d 377

(Minn.2008) (ruling that a party may move to renew a judgment "within ten years after entry of the original judgment," "so that the judgments extend beyond the initial ten-year period"); *Jahner v. Jacob,* 515 N.W.2d 183, 186 (N.D.1994) (providing that an "original judgment" may be renewed under state law); *In re Sitarz,* 150 B.R. 710, 725 n. 20 (Bankr.D.Minn.1993) (noting that the "original judgment lapses" and is unenforceable if it is not renewed). By stating that an "original judgment" may be extended, the courts were necessarily referring to a judgment with enforceable claims, because only a valid judgment may be extended. *See supra.*

10. California Code of Civil Procedure § 683.020 states: "Except as otherwise provided by statute, upon the expiration of 10 years after the date of entry of a money judgment or a judgment for possession of property: (a) The judgment may not be enforced." *Iliff,* 107 Cal.App. 4th at 1207, 132 Cal.Rptr.2d at 853. California Code of Civil Procedure § 683.130(a) states ·in pertinent part that a lump-sum money judgment may be extended by renewal of the judgment "at any time before the expiration of the 10–year period of enforceability." *Id.*

resolve a claim or cause of action for a party in a case that involves multiple plaintiffs or defendants. Under such conditions, the first-in-time judgment has absolutely no bearing on subsequent judgments and does not create any "form or type from which varieties are derived."

In contrast, an unextended valid judgment that created the rights that a party is seeking to extend is consistent with the foregoing definition of an "original" judgment. The "beginning" stage of a valid and not previously extended judgment is the "primary form or type from which varieties[, *i.e., extended judgments*,] are derived." *Webster's Encyclopedic Unabridged Dictionary of the English Language* 1015. Each unextended judgment that has an enforceable claim—even those that pertain to only one of multiple parties or issues—is an "original" judgment under the foregoing definition, because it may be the "primary form or type from which" extended judgments are derived.[11] Based on the plain language of the statute, we cannot conclude that "original judgment" refers to the first-in-time judgment. We hold, rather, that "original judgment" of HRS § 657–5 pertains to the judgment that creates the rights and responsibilities that the moving party is seeking to enforce and extend.

Imelda Marcos does not point to a single jurisdiction that (1) prohibits an extension on an unextended judgment that is not expired or (2) starts the statute of limitations for extending an amended judgment at the time the first-in-time judgment is rendered. We can think of no reason why the first-in-time judgment should control the timing of the extension of all subsequent judgments.[12]

Based upon the plain language of the statute, and construed *in pari materia* within the framework of the entire statutory scheme governing limitations of actions, "original judgment" of HRS § 657–5 refers to the judgment that creates the rights and responsibilities that the party is seeking to extend.

## C. An Amended "Original Judgment"

We next must address the issue of when the time limit begins for extending a judgment where the judgment that created the enforceable rights was amended. In light of the above interpretation of "original judgment," the time limit for extending a judgment that created the enforceable rights at issue and is later amended, depends on the type of amendment. *Cf. Poe v. Hawai'i Labor Relations Bd.*, 98 Hawai'i 416, 418–19, 49 P.3d 382, 384–85 (2002). In *Poe*, this court determined whether the appellant timely filed a notice of appeal under Hawai'i Rules of Appellate Procedure Rule 4(a)(1), which requires the notice to be filed "within [thirty] days after entry of the judgment or appealable order." 98 Hawai'i at 418, 49 P.3d at 384. The appellant filed a notice of appeal twenty-nine days after a second amended judgment, but more than thirty days after the entry of the first amended judgment. *Id.* at 417, 49 P.3d at 383.

In deciding from what date to measure the time for appeal, this court declared:

The general rule is that where a judgment is amended in a material and substantial respect, the time within which an appeal from such determination may be taken begins to run from the date of the amendment, although where the amendment relates only to the correction of a clerical ... error, it does not affect the time allowed for appeal.

---

**11.** Under this construction of "original judgment," there may be more than one "original judgment." *See Kronstadt v. Kronstadt*, 238 N.J.Super. 614, 570 A.2d 485, 486, 488 (1990) (referring to two judgments that decided different issues on the case as "original judgments" in the context of reviving the original judgments under a law that permits enforcement "within five years of the Judgment's original rendering").

**12.** As discussed *supra*, the ICA's construction of HRS § 657–5 is flawed particularly where the enforceable claim or right that a party seeks to extend may not have been created at the time of the first-in-time judgment. Based on the procedural history of the case, the first-in-time judgment is an arbitrary starting point to begin the statute of limitations for a subsequent judgment that was amended in a material and substantial way. Further, there is no basis for permitting the first-in-time judgment to be enforceable for up to twenty years, while precluding some judgments from any extension at all.

*Id.* at 418, 49 P.3d at 384 (quoting *Korsak v. Hawai'i Permanente Medical Group*, 94 Hawai'i 297, 304, 12 P.3d 1238, 1245 (2000) (quoting *Interstate Printing Co. v. Department of Revenue*, 236 Neb. 110, 459 N.W.2d 519 (1990))). *Poe* observed that an amended judgment that did not materially alter rights "did not create a right of appeal where one did not exist," and, thus, did not extend the time allowed for appeal. *Id.* at 419, 49 P.3d at 385.

We hold that a rule similar to *Poe* and *Korsak* should be adopted here. Where an unextended judgment is "amended in a material and substantial respect," so that it *creates the rights that are being extended,* the time within which a motion to extend the judgment may be brought "begins to run from the date of the amendment," because that judgment created those rights. *See Poe,* 98 Hawai'i at 418–19, 49 P.3d at 384–85. Where, on the other hand, the unextended judgment merely makes non-substantive or non-material amendments to a prior judgment, it does not *create* an enforceable right. In that situation, it is not appropriate that the amended judgment extend the time allowed to revive the enforceable judgment.[13]

■ Under the foregoing rule, a judgment that is entered *nunc pro tunc* as of a prior date may be the "original judgment" for purposes of HRS § 657-5 if it changed a prior order in a material and substantial manner. Although we have stated that a *"nunc pro tunc* order relates back to the original date of the matter it affects," *Keahole Defense Coalition, Inc. v. Board of Land and Natural Resources,* 110 Hawai'i 419, 430, 134 P.3d 585, 596 (2006) (quoting *Poe,* 98 Hawai'i at 423, 49 P.3d at 389 (Acoba, J., dissenting)), the date of the prior entry is not "the effective date of the judgment for all purposes." *Borer v. Chapman,* 119 U.S. 587,

602, 7 S.Ct. 342, 30 L.Ed. 532 (1887). As the United States Supreme Court explained, a *nunc pro tunc* date is "a fiction of law, made and considered to be the true date of the judgment" only to "bind the defendant by the obligation" of the earlier date. *Borer,* 119 U.S. at 602, 7 S.Ct. 342.

■ Hawai'i appellate courts have determined that, even when a judgment is entered *nunc pro tunc* to a prior date, the statute of limitations for filing a notice of appeal begins on the date that the judgment was actually entered, rather than from the *nunc pro tunc* date. *See One Boat,* 119 Hawai'i at 250–52, 254, 195 P.3d at 1182–84, 1186 (holding that the defendant timely filed a notice of appeal from a judgment that was entered *nunc pro tunc,* effective on a date two years prior, because the defendant could not actually appeal from the order until it was reduced to a judgment); *Carlisle v. One Boat,* 118 Hawai'i 107, 185 P.3d 855 (App.2008).[14] Similarly, even though a judgment is entered *nunc pro tunc* as of a prior date, a court can only extend that judgment after it is actually entered. The fact that the judgment is entered *nunc pro tunc* does not alter the date that the "original judgment" was rendered. Pursuant to the "original judgment" test set forth above, the *nunc pro tunc* date will only serve as the date the "original judgment" was rendered if the subsequent judgment made a non-substantive change. However, a judgment that is entered *nunc pro tunc* will begin the limitations period for extending the judgment where it materially or substantially amended the earlier judgment.

Thus, where multiple judgments created the same rights that the party is seeking to extend, the "original judgment" is (1) the unamended judgment where the amended

---

**13.** This construction addresses Judge Leonard's concern against "effectively extend[ing] the life of any final judgment that is amended before, by, or after an appeal, no matter how significant or insignificant an amendment might be." *Roxas I,* 120 Hawai'i at 128, 202 P.3d at 589 (Leonard, J., concurring).

**14.** In *One Boat,* the circuit court entered an order dismissing a petition against the defendant on February 1, 2002, and it entered a judgment over two years later, on December 6, 2004. 119

Hawai'i at 250–52, 195 P.3d at 1182–84. Defendant moved to amend the judgment to correct errors and enter the judgment *nunc pro tunc,* effective on the date of the order, February 1, 2002. *Id.* at 251, 195 P.3d at 1183. The circuit court granted this motion, but it "held that the *nunc pro tunc* provision could not be used to defeat the State's right to appeal from the judgment and the State's time to appeal ran from the date of entry of the circuit court's order." *Id.*

judgment makes non-material amendments to a prior judgment, but (2) the amended judgment where it amended the prior judgment "in a material and substantial respect."

## D. Moving To Extend The Second and Fourth Amended Judgments

Under the foregoing construction of HRS § 657–5, Petitioners timely sought to extend the Second and Fourth Amended Judgments. Petitioners moved to extend these judgments within ten years of the date that the judgments that created the rights to be extended were rendered.

█ The Second Amended Judgment, filed on October 18, 1999, granted judgment "in favor of [Dacanay,] as personal representative of the estate of Roger Roxas in the amount of $6 million in general damages for false imprisonment and battery against Imelda Marcos in her personal capacity, to the extent of her interest in the Marcos Estate." This right was created by the Second Amended Judgment. The first-in-time judgment (rendered on August 28, 1996) and the Amended Judgment (rendered on October 21, 1996) do not qualify as an "original judgment" for purposes of extending the Second Amended Judgment, because they did not present enforceable rights on Petitioners' claims of battery and false imprisonment against Imelda Marcos *in her personal capacity*. *See Roxas I*, 89 Hawai'i at 114, 969 P.2d at 1232 (vacating the portion of the Amended Judgment entered against "Defendant Imelda Marcos, as Personal Representative of the Estate of Ferdinand Marcos"). The first-in-time judgment and Amended Judgment were materially and substantially changed by the Second Amended Judgment.[15] Accordingly, the Second Amended Judgment is the "original judgment" on the false imprisonment and battery claims against "Imelda Marcos in her personal capacity, to the extent of her interest in the Marcos Estate."

Petitioners sought to extend the Second Amended judgment on May 8, 2007. This motion was filed within ten years of the date the original judgment, the Second Amended Judgment (filed on October 18, 1999) was rendered. Accordingly, the circuit court properly ordered that the Second Amended Judgment be extended.

█ Petitioners also sought to extend the Fourth Amended Judgment, which awarded GBC over $13 million in damages and pre-judgment interest against "Imelda Marcos in her personal capacity, to the extent of her interest in the Marcos Estate" for a conversion claim. The "original judgment" that created this right is the Third Amended Judgment. The first-in-time, Amended, and Second Amended Judgments[16] did not render this right to GBC. *See Roxas I*, 89 Hawai'i at 157, 969 P.2d at 1275 (reversing the circuit court's Amended Judgment against Defendant Imelda Marcos, as Personal Representative of the Estate of Ferdinand Marcos, with respect to GBC's conversion claim and remanding the matter for a new trial on the value of this claim).

The Third Amended Judgment, which was entered on June 26, 2000, was amended by the Fourth Amended Judgment on September 6, 2001. Yet, the Fourth Amended Judgment's only change to the Third Amended Judgment was an additional paragraph, stating, "The court expressly determines that there is no just reason for delay and expressly directs for the entry of judgment." This was merely a non-substantive change—it did not change the Third Amended Judgment in a material manner. Thus, the "original judgment," for purposes of extending the Fourth Amended Judgment, is the Third Amended Judgment. Petitioners sought to extend the Fourth Amended Judgment on May 8, 2007, within ten years of June 26, 2000, the date the Third Amended Judgment was rendered. Accordingly, the circuit court was permitted to extend the Fourth Amended Judgment.

---

15. The fact that the Second, Third, and Fourth Amended Judgments were "entered *nunc pro tunc* as of October 21, 1996," the date of the Amended Judgment, does not alter the date that the "original judgments" were rendered. *See supra.*

16. The Second Amended Judgment did not present any enforceable right on GBC's conversion claim. It stated that the court retained jurisdiction over GBC's conversion claims.

### E. Extending The Fourth Amended Judgment Beyond Twenty Years Of the Original Judgment

The circuit court extended the Second Amended Judgment until October 17, 2019, and the Fourth Amended Judgment until September 5, 2021. The extension of the Second Amended Judgment to October 17, 2019 was proper, inasmuch as this date is less than twenty years from the date of its "original judgment" (the Second Amended Judgment, entered on October 18, 1999). *See* HRS § 657–5 ("A court shall not extend any judgment or decree beyond twenty years from the date of the original judgment or decree."). However, the circuit court erred by extending the Fourth Amended Judgment (filed on September 6, 2001) to September 5, 2021, inasmuch as the extension is more than twenty years beyond the date of the "original judgment."

As determined *supra,* the "original judgment" for purposes of extending the Fourth Amended Judgment is the Third Amended Judgment. Because the Third Amended Judgment was rendered on June 26, 2000, the court was precluded from extending the Fourth Amended Judgment beyond June 25, 2020. *See* HRS § 657–5 ("A court shall not extend any judgment or decree beyond twenty years from the date of the original judgment or decree."). The court, therefore, erred when it extended the Fourth Amended Judgment beyond June 25, 2020.

### IV. CONCLUSION

Based upon the foregoing analysis, we (1) vacate the ICA's March 5, 2009 judgment, (2) vacate the circuit court's July 24, 2007 order, to the extent that it granted Petitioners' motion to extend the fourth amended judgment until September 5, 2021, and (3) remand this case to the circuit court for further proceedings consistent with this opinion.