231 P.3d 60

C. BREWER AND COMPANY, LIM-
ITED, a Hawaii Corporation,
Plaintiff–Appellee,

v.

HAWAII INSURANCE GUARANTY AS-
SOCIATION, a statutorily created non-
profit unincorporated legal entity, De-
fendant–Appellant.

No. 29342.

Intermediate Court of Appeals of Hawai'i.

April 28, 2010.

Kevin P.H. Sumida, Honolulu, (Sumida & Tsuchiyama), on the briefs, for defendant-appellant.

1. The Honorable Victoria S. Marks presided.

Gary G. Grimmer (Carlsmith Ball LLP), Honolulu, on the briefs, for plaintiff-appellee.

NAKAMURA, C.J., FOLEY and FUJISE, JJ.

Opinion of the Court by FOLEY, J.

Defendant–Appellant Hawaii Insurance Guaranty Association (HIGA) appeals from the Stipulated Final Judgment filed on August 20, 2008 in the Circuit Court of the First Circuit [1] (circuit court). The circuit court entered final judgment in favor of Plaintiff–Appellee C. Brewer and Company, Limited (C. Brewer) and awarded C. Brewer damages in the amount of $106,150.11. The Stipulated Final Judgment incorporated by reference the circuit court's "Order Granting Plaintiff's Motion for Partial Summary Judgment Filed May 10, 2006 on Stipulated Facts Filed December 4, 2006" (Order Granting MPSJ) filed on December 28, 2006, and "Rule 54(b) Judgment" filed on January 11, 2007.

On appeal, HIGA contends the circuit court erred in granting C. Brewer's May 10, 2006 Motion for Partial Summary Judgment (MPSJ) and disputes the portion of the Rule 54(b) Judgment stating that C. Brewer "is entitled to recover under [Hawaii Revised Statutes (HRS)] § 431:16–101 et seq., the amount of covered claims that would have been paid by the insolvent excess workers['] compensation insurer had it not become insolvent." HIGA further contends C. Brewer is not entitled to recover under the Hawaii Insurance Guaranty Association Act (the Act), codified by HRS § 431:16–101 et seq., because C. Brewer's "net worth" on December 31, 2002 exceeded the $25 million statutory threshold for recovery. HIGA argues that "net worth," according to HRS § 431:16–105 (2005 Repl.), should be calculated according to a "common sense," dictionary, and "universally accepted" definition (hereinafter, "the common sense approach"), and according to "the common sense approach," C. Brewer's net worth exceeded the threshold. HIGA's arguments are premised on the notion that generally accepted ac-

counting principles (GAAP)[2] and "the common sense approach" are incompatible and that "net worth" under HRS § 431:16–105 may not be calculated according to GAAP.

We disagree with HIGA that "net worth" according to HRS § 431:16–105 may not be calculated according to GAAP and affirm the Stipulated Final Judgment.

## I.

■ The Hawai'i legislature created HIGA to provide claims coverage to certain insureds if their insurers become insolvent and claims covered under existing policies arise. *Villagonza v. Hawaii Ins. Guar. Ass'n,* 70 Haw. 406, 408, 772 P.2d 1193, 1195 (1989); *see also* HRS § 431:16–108 (2005 Repl.) (describing HIGA's powers and duties). HIGA defrays the cost of covering the claims through assessments levied on its members. *Villagonza,* 70 Haw. at 409–10, 772 P.2d at 1195. However, HIGA is authorized to pay only "covered claims," HRS § 431:16–102 (2005 Repl.), which are defined by HRS § 431:16–105:

"Covered claim":

(1) Means an unpaid claim, including one for unearned premiums, submitted by a claimant, that arises out of and is within the coverage and is subject to the applicable limits of an insurance policy to which this part applies issued by an insurer, if the insurer becomes an insolvent insurer after July 1, 2000,

. . . .

(2) Shall not include:

. . . .

(D) Any first party claims by an insured whose *net worth* exceeds $25,000,000 on December 31 of the year prior to the year in which the insurer becomes an insolvent insurer; provided that an insured's net worth on that date shall be deemed to include the aggregate net worth of the insured and all of its subsidiaries as calculated on a consolidated basis[.]

(Emphasis added.)

In the instant case, the following facts are undisputed. C. Brewer bought excess workers' compensation insurance coverage from The Home Insurance Company (Home). On June 13, 2003, the New Hampshire Superior Court declared Home insolvent. By December 31, 2004, C. Brewer had paid out roughly $322,000 in excess workers' compensation claims, which would have been covered under the Home policy. C. Brewer consequently turned to HIGA for reimbursement. To prove its "net worth" as of December 31, 2002, C. Brewer submitted Combined Financial Statements for fiscal years ending June 30, 2002 and 2003 to HIGA. Although these statements indicated that C. Brewer's total equity interest on December 31, 2002 was

---

**2.** In *Bolt v. Merrimack Pharmaceuticals, Inc.,* 503 F.3d 913, 917 n. 6 (9th Cir.2007) (citations omitted), the United States Court of Appeals for the Ninth Circuit stated the following regarding GAAP:

GAAP is not found in a single source. Instead, in the United States, GAAP consists of a hodgepodge of accounting sources, which find their respective places in the hierarchical structure established by the American Institute of Certified Public Accountants ("AICPA"). There are five categories in the GAAP hierarchy. Officially established accounting principles, referred to as Category (a) authority, are the highest level and include the Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards and Interpretations, Accounting Principles Board ("APB") Opinions, and AICPA Accounting Research Bulletins. . . . Category (b) authority, the next highest level, consists of FASB Technical Bulletins and, if cleared by FASB, AICPA Industry Audit and Accounting Guides and AICPA Statements of Position. The third level

of authority, Category (c), consists of AICPA Accounting Standards Executive Committee Practice Bulletins that have been cleared by FASB and consensus positions of the FASB Emerging Issue Task Force. Category (d), the fourth level of authority, consists of AICPA accounting interpretations and implementation guides published by the FASB staff, and practices that are widely recognized and prevalent either generally or in the industry. In the absence of established accounting principles, auditors may consider accounting literature in the fifth and final level of authority, which includes FASB Statements of Financial Accounting Concepts; APB Statements; AICPA Issues Papers; International Accounting Standards of the International Accounting Standards Committee ("IASC"); Governmental Accounting Standards Board ("GASB") Statements, Interpretations, and Technical Bulletins; pronouncements of other professional associations or regulatory agencies; AICPA Technical Practice Aids; and accounting textbooks, handbooks, and articles.

$15,954,000, HIGA treated a $116 million debt that Buyco (C. Brewer's parent company) owed C. Brewer as an asset and concluded that C. Brewer's "net worth" exceeded $25 million. On September 28, 2004, HIGA denied C. Brewer's claim.

On March 31, 2005, C. Brewer filed a complaint against HIGA in circuit court, alleging that HIGA was statutorily obligated to reimburse C. Brewer for the losses it suffered because of Home's insolvency. In its April 22, 2005 answer, HIGA stated that it was without knowledge or information sufficient to form a belief as to the allegation, except as to its rights, duties, and obligations as defined in HRS Chapter 431, Article 16.

C. Brewer filed its MPSJ, and HIGA filed a memorandum in opposition. In support of its MPSJ, C. Brewer presented expert opinion that C. Brewer's "net worth" was calculated according to GAAP. In support of its opposition memorandum, HIGA presented expert testimony that C. Brewer's "net worth" should be calculated according to other principles.

On December 4, 2006, the parties filed Stipulated Facts, which included the following: (1) at all relevant times, C. Brewer was a wholly owned subsidiary of Buyco; (2) Buyco approved a plan to liquidate and dissolve; (3) as part of this plan, C. Brewer made distributions to Buyco totaling $116 million; (4) Buyco would not be able to pay back these distributions; (5) the fair market value of C. Brewer's assets as of December 31, 2002 exceeded $25 million; (6) C. Brewer's audited financial statements and related total equity interest computations were prepared in accordance with GAAP; and (7) C. Brewer's auditor's position was that GAAP required that C. Brewer determine its total equity interest by offsetting the $116 million due from Buyco.

At a hearing on the MPSJ on December 22, 2006, the circuit court orally held that GAAP should be used to determine net worth pursuant to HRS § 431:16–105, stating that GAAP is "really the only uniform set of accounting principles that apply." The circuit court filed the Order Granting MPSJ and entered the Rule 54(b) Judgment. HIGA appealed. This court dismissed the

appeal because the circuit court had failed to file an appealable judgment. On August 20, 2008, the circuit court filed the Stipulated Final Judgment, from which HIGA timely appealed.

## II.

### A. Summary Judgment

■ The Hawai'i Supreme Court has stated that an appellate court

> reviews the circuit court's grant of summary judgment *de novo. Price v. AIG Hawai'i Ins. Co.,* 107 Hawai'i 106, 110, 111 P.3d 1, 5 (2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [Hawai'i Rules of Civil Procedure] Rule 56(c).

*Gillan v. Gov't Employees Ins. Co.,* 119 Hawai'i 109, 114, 194 P.3d 1071, 1076 (2008).

### B. Conclusions of Law (COLs)

■ [The appellate] court reviews the trial court's COLs de novo. A COL is not binding upon an appellate court and is freely reviewable for its correctness. Moreover, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned.

*Bhakta v. County of Maui,* 109 Hawai'i 198, 208, 124 P.3d 943, 953 (2005) (internal quotation marks, citations, and brackets in original omitted).

### C. Statutory Interpretation

■ Questions of statutory interpretation are questions of law to be reviewed *de novo* under the right/wrong standard.

> Our statutory construction is guided by the following well established principles:
>
> [When construing a statute,] our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory lan-

guage in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

[The appellate] court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning.

*Lingle v. Hawai'i Gov't Employees Ass'n, AFSCME, Local 152, AFL–CIO*, 107 Hawai'i 178, 183, 111 P.3d 587, 592 (2005) (internal quotation marks, brackets in original, and ellipses omitted) (quoting *Guth v. Freeland*, 96 Hawai'i 147, 149–50, 28 P.3d 982, 984–85 (2001)).

### III.

A. **"Net worth" under HRS § 431:16–105 may be calculated according to GAAP.**

HIGA and C. Brewer fundamentally disagree on the meaning and method of valuing "net worth." C. Brewer argues that "net worth" under HRS § 431:16–105 refers to a company's shareholder's equity and is "book" or "balance sheet" net worth, as indicated on an entity's financial statements prepared in accordance with GAAP. C. Brewer agrees with HIGA that under GAAP, "net worth" means recorded assets minus recorded liabilities; however, C. Brewer argues that its assets, calculated according to GAAP, do not include the $116 million due from Buyco.

HIGA argues the following: according to the plain language of HRS § 431:16–105, the term "net worth" should be calculated according to "the common sense approach"; according to that approach, C. Brewer's as-

sets should be valued at fair market value (FMV) and the $116 million owed to C. Brewer by Buyco should be characterized as an asset; and taking into account the moneys owed by Buyco and/or the FMV of C. Brewer's assets, C. Brewer's "net worth" exceeded the $25 million threshold. Alternatively, HIGA claims that according to "the common sense approach," C. Brewer's assets and liabilities at the relevant time, as reported by C. Brewer on combined balance sheets (attached to MPSJ as Exhibit "C"), may be calculated to arrive at C. Brewer's net worth and according to the balance sheets, C. Brewer's "total liabilities" of $75 million subtracted from the company's reported "net earnings" of $109 million results in a net worth amount exceeding $25 million. HIGA does not significantly dispute that calculated according to GAAP, C. Brewer's net worth at the relevant time was within the threshold set forth in HRS § 431:16–105; rather, HIGA argues that "net worth" under HRS § 431:16–105 may not be calculated according to GAAP.

Our review is limited to a single issue: whether the "net worth" of a company, such as C. Brewer, may be determined according to GAAP for the purposes of determining whether the company's claim is "covered" under HRS § 431:16–105. If the answer to this question is yes, the circuit court did not err in issuing the Stipulated Final Judgment.

We look to the plain language of the Act to discern the intended meaning and method of valuing "net worth." *See Lingle*, 107 Hawai'i at 183, 111 P.3d at 592. The Act does not define "net worth," except to state that "an insured's net worth on that date [December 31 of the year prior to the year in which the insurer becomes insolvent] shall be deemed to include the aggregate net worth of the insured and all of its subsidiaries as calculated on a consolidated basis." HRS § 431:16–105(2)(D). When a term in a statute is undefined, we also look to dictionaries to determine the term's ordinary meaning. *Estate of Roxas v. Marcos*, 121 Hawai'i 59, 66, 214 P.3d 598, 605 (2009). *Black's Law Dictionary* 1639 (8th ed. 2004) defines "net worth" as "[a] measure of one's wealth, [usually] calculated as the excess of total assets

over total liabilities." Additionally, we interpret terms in a statute with reference to the statute's policy and purpose. *Lingle*, 107 Hawai'i at 183, 111 P.3d at 592. HRS § 431:16–102 expressly indicates that the purpose of the Act is "to avoid excessive delay in payment and, to the extent provided in this part, to minimize financial loss to claimants or policyholders because of the insolvency of an insurer." These interpretative tools provide us with little guidance in addressing the issue in this case.

Hawai'i courts have not addressed this issue; hence, we look to case law in other jurisdictions for assistance. *See, e.g., Sierra Club v. Dep't of Transp. of State of Hawai'i*, 120 Hawai'i 181, 200–03, 202 P.3d 1226, 1245–48 (2009) (where Hawai'i Supreme Court considered case law in other jurisdictions to interpret constitutional provision because there were no cases on point in this jurisdiction); *County of Hawai'i v. C & J Coupe Family Ltd. P'ship*, 119 Hawai'i 352, 369, 198 P.3d 615, 632 (2008) (stating that a survey of opinions from other jurisdictions was useful where no Hawai'i case addressed whether abatement was a question of subject matter jurisdiction).

Although the act at issue in *Sanders v. Jackson*, 209 F.3d 998 (7th Cir.2000), is dissimilar to the Act in this case, *Sanders* provides guidance in construing "net worth." *Sanders* concerned the meaning of the term under the portion of the Fair Debt Collection Practices Act (FDCPA) limiting recovery of class action damages to part of a debt collector's "net worth." *Id.* at 999. The FDCPA does not define "net worth." *Id.* at 1000. The United States Court of Appeals for the Seventh Circuit held that "net worth" referred to the debt collector's "book" or "balance sheet" net worth. *Id.* at 1000–01. In so holding, the Seventh Circuit noted that federal courts have similarly interpreted parallel "net worth" provisions in many federal statutes, including the Equal Access to Justice Act (EAJA):

> One of these … types of statutes is the [EAJA], which permits parties that prevail against the government to obtain the costs of litigation, but only if the individual's "net worth does not exceed $2,000,000." 5

U.S.C. § 504(b)(1)(B). In *Continental Web Press Inc. v. N.L.R.B.*, we examined the term "net worth" in the context of this EAJA provision. 767 F.2d 321, 323 (7th Cir.1985). There the NLRB [National Labor Relations Board] argued that in calculating net worth, Continental's assets should be valued at cost rather than cost minus depreciation. We held that the proper valuation entails a depreciation of assets because that is the procedure prescribed by [GAAP].

> Congress did not define the statutory term "net worth." It seems a fair guess that if it had thought about the question, it would have wanted the courts to refer to [GAAP]. What other guideline could there be? Congress would not have wanted us to create a whole new set of accounting principles just for use in cases under the [EAJA].

*Id.* This holding is consistent with our prior holding in *Telegraph Savings and Loan Association v. Schilling* that GAAP should also be used to determine a bank's net worth as that term is defined by federal banking statutes. 703 F.2d 1019, 1027–28 (7th Cir.1983). Not surprisingly, when the Ninth Circuit was asked to define net worth for purposes of the EAJA, it also held that GAAP should govern. *American Pac. Concrete Pipe Co., Inc. v. N.L.R.B.*, 788 F.2d 586, 591 (9th Cir.1986) (adopting this reasoning and holding of *Continental Web Press* ).

Implicit in these holdings is the conclusion that the statutory term net worth means book net worth or balance sheet net worth, because GAAP has meaning only in the context of financial statement reporting—GAAP dictate the standards for reporting and disclosing information on an entity's financial statements. While those cases involved different statutes, we believe their reasoning applies equally to the FDCPA. Accordingly, because there is no indication in the FDCPA that the term net worth should be used in anything but its normal sense, we also look to book net worth or balance sheet net worth as reported consistently with GAAP.

209 F.3d at 1001 (footnote omitted). We find the reasoning in *Sanders* persuasive.

■ In the instant case, in light of the foregoing and the Hawai'i legislature's silence on the meaning and means of valuing "net worth" under HRS § 431:16–105, we hold that "net worth" may be "book" or "balance sheet" net worth as governed by GAAP. This interpretation furthers the explicit purpose of the Act—"to avoid excessive delay in payment and . . . to minimize financial loss to claimants or policyholders because of the insolvency of an insurer"— because it provides a uniform system for efficiently determining eligibility under the Act. HRS § 431:16–102.

In so holding, we note that GAAP comports with the definition of "net worth" set forth in *Black's Law Dictionary* and HIGA has created a false dilemma by distinguishing between the two. *See, e.g., Broaddus v. U.S. Army Corps of Eng'rs*, 380 F.3d 162, 166–67 (4th Cir.2004) (holding that unambiguous meaning of "net worth" under [EAJA] is total assets less total liabilities according to GAAP); *Sanders*, 209 F.3d at 999–1002 (holding that plain meaning of "net worth" under FDCPA is total assets less total liabilities according to GAAP, which is balance-sheet or book net worth). The main disagreement between the parties in this case concerns not whether "net worth" is assets minus liabilities, but the "assets" part of that equation, i.e., what value to assign a company's assets and whether an amount of money owed to a company should be considered an asset.

We also note that numerous other HRS statutes call for financial accounting according to GAAP. *See, e.g.,* HRS §§ 489D–6 (2008 Repl.) (providing that a person licensed under Chapter 489D, "Money Transmitters Act," shall have a certain net worth, calculated according to GAAP); 412:3–108 (2004 Repl.) ("Every Hawaii financial institution shall follow [GAAP], except as otherwise prescribed by the appropriate federal regulatory agency"); 40–2 (2009 Repl.) (stating that the University of Hawai'i and Hawai'i Department of Education may install accounting systems that conform with GAAP); 103D–314 (1993) (providing that except with re-spect to firm fixed-price contracts, no contract by a proposed contractor with the government shall be used unless it has been determined that "[t]he proposed contractor's accounting system is adequate to allocate costs in accordance with [GAAP]"); 302B–1 (2007 Repl.) (partly defining the "organizational viability" of a charter school as "operates in accordance with [GAAP]"); 323F–22 (Supp. 2009) (stating that the Hawaii Health Systems Corporation "shall engage a certified public accountant to conduct an annual audit of its financial affairs, books, and records in accordance with [GAAP]"); 412:3–112 (2004 Repl.) & 412:1–109 (2004 Repl.) (providing that trust companies shall file written reports with the commissioner of financial institutions containing audited financial statements prepared in accordance with GAAP); 449–15 (1993) & 449–1 (1993) (stating that an escrow depository must submit to the commissioner of financial institutions its annual financial statements, prepared in accordance with GAAP); 466–5 (Supp. 2009) & 466–4 (1993 & Supp. 2009) (providing that the state board of public accountancy may license and grant the designation of "certified public accountant" to any person who has completed "one thousand five hundred chargeable hours in the performance of audits involving the application of [GAAP] and auditing standards earned while in public accounting practice").

Last, we note that HIGA has not provided any persuasive authority for the notion that GAAP may not be used to calculate "net worth" under HRS § 431:16–105, and we find none.

Accordingly, we hold that the "net worth" of a company, such as C. Brewer, may be valued according to GAAP for the purposes of determining whether the company's claim is "covered" under HRS § 431:16–105. The circuit court did not err by issuing the Stipulated Final Judgment in favor of C. Brewer.

**B.  Remaining points.**

HIGA's remaining points of error are premised on the notion that "net worth" may not be calculated according to GAAP, under HRS § 431:16–105. Because we have already held that the converse is true, we need not address these points.

## IV.

The Stipulated Final Judgment filed August 20, 2008 in the Circuit Court of the First Circuit is affirmed.