**Electronically Filed
Supreme Court
SCWC-20-0000038
15-SEP-2025
01:56 PM
Dkt. 19 OPA**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

_____

WILLIAM S. PERREIRA,
Petitioner/Plaintiff-Appellant,

vs.

GERTRUDE B. PERREIRA n.k.a. GERTRUDE B. HAIA,
Respondent /Defendant-Appellee.

_____

SCWC-20-0000038

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-20-0000038 and CAAP-21-0000107; FC-D NO. 88-279)

SEPTEMBER 15, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.   INTRODUCTION

This case arises from a marital property division dispute between former spouses, Petitioner/Plaintiff-Appellant William S. Perreira (William) and Respondent/Defendant-Appellee Gertrude B. Perreira n.k.a. Gertrude B. Haia (Barbara), over

1

Barbara's share of William's State of Hawaiʻi Employees' Retirement System (ERS) benefits following their 1989 divorce.

William presents two questions to this court. First, whether Barbara's 2008 motion to enforce the Family Court of the Third Circuit's division order was time-barred by the ten-year statute of limitations under Hawaiʻi Revised Statutes (HRS) § 657-5 (Supp. 2001). Second, whether the family court's entry of a Hawaiʻi Domestic Relations Order (HiDRO) under HRS § 88-93.5 (Supp. 2018) was an ex post facto violation of William's rights under the United States Constitution and Hawaiʻi law.

For the reasons discussed below, we answer both questions in the negative. Accordingly, we affirm the Intermediate Court of Appeals' (ICA) judgment on appeal.

## II.   BACKGROUND

In 1990, the Family Court of the Third Circuit (family court) awarded Barbara a percentage of William's ERS retirement benefit, with payments to commence at "the earliest date when [William] shall be qualified to retire." William subsequently qualified to retire on April 1, 1999.

In 2008, having not received any payments for her share of William's retirement benefit, Barbara moved to enforce the original division order. In 2012, the family court granted Barbara's motion and awarded her 31% of William's pension as valued on the date which he qualified to retire. In 2017,

2

Barbara moved for further relief, alleging that William had failed to disclose information regarding the value of his retirement benefits and further failed to make any payments pursuant to the 2012 order. In 2019, the family court again granted Barbara's motion, consistent with the 2012 order. The court further awarded Barbara 10% per annum interest along with attorneys' fees and costs related to both her 2008 and 2017 motions.

William appealed the 2019 orders arguing, inter alia, that Barbara's original 2008 motion to enforce was time-barred by the ten-year statute of limitations imposed by HRS § 657-5.

In August 2020, while the 2019 orders were pending on appeal to the ICA, Barbara moved for entry of a HiDRO under HRS § 88-93.5. The family court granted her motion, finding that Barbara was entitled to William's entire monthly retirement pension until the sums due to her pursuant to the 2019 orders were satisfied in full. In March 2021, the family court entered a HiDRO directing the ERS to pay to Barbara $5,246.85 per month, William's total monthly distribution. William appealed the order granting HiDRO, arguing that HRS § 88-93.5, which took effect on July 1, 2020, could not be applied retroactively to the family court's 2019 orders.

The ICA consolidated the appeals and, on January 31, 2025, issued a memorandum opinion. As to William's appeal of

the 2019 orders, the ICA held that Barbara's right to enforce the family court's 1990 division order did not accrue until William qualified for retirement on April 1, 1999, and, thus, Barbara's 2008 motion to enforce was not time-barred. Regarding the family court's order granting HiDRO, the ICA reversed the HiDRO without expressly addressing William's ex post facto argument and remanded "solely for the family court to enter a final judgment to clarify the record."

William timely filed an application for writ of certiorari, which we accepted.

### III.  DISCUSSION

William argues on certiorari that the ICA gravely erred in holding that Barbara's 2008 motion to enforce was not barred by the statute of limitations. This argument lacks merit.

Generally, "we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant." Kakinami v. Kakinami, 125 Hawai'i 308, 311-12, 260 P.3d 1126, 1129-30 (2011) (quoting Fisher v. Fisher, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006)).

HRS § 657-5 prohibits a person seeking enforcement of a judgment or decree from doing so "after the expiration of ten years from the date a judgment or decree was rendered." If the

4

ten-year statute of limitations expires before enforcement or an extension is sought, then the judgment or decree is "presumed to be paid and discharged." Id.

William argues that statute of limitations began to run as of the date the 1990 Division Order was filed. However, in construing HRS § 657-5, this court has previously held that the statute of limitations for enforcing a judgment does not begin to run until "the cause of action—the judgment that creates the enforceable claim or right—comes into existence as an enforceable claim or right." Estate of Roxas v. Marcos, 121 Hawaiʻi 59, 69, 214 P.3d 598, 608 (2009) (internal quotation marks omitted). It would be illogical, and contrary to our well-established case law, to require that parties seek enforcement of a divorce decree or judgment, as William proposes, before the obligor is even in default. Cf. Segelken v. Hawaiian Tr. Co., 20 Haw. 225, 228 (Haw. Terr. 1910) ("[W]hen the payment of a claim or the liability of a party is made dependent upon the performance of any condition precedent or the happening of any contingency, a right of action does not accrue, or the statute begin to run, until the performance of such condition or the happening of such contingency.").

Here, William was not obligated to begin making payments, and Barbara's right to enforce the judgment did not "come[] into existence," until "the earliest date when [William]

5

shall be qualified to retire," which the family court determined to be April 1, 1999.  See Estate of Roxas, 121 Hawai'i at 69, 214 P.3d at 608.  Thus, Barbara's 2008 Motion to Enforce was not time-barred because the statute of limitations under HRS § 657-5 did not expire until April 1, 2009, ten years after William reached retirement eligibility and the first monthly payment became due.

William also argues on certiorari that, because the statute took effect after the divorce decree and division orders were entered, the application of HRS § 88-93.5 is an ex post facto violation of article I, section 10 of the United States Constitution, HRS § 1-3 (2009), and Hawai'i state and federal case law.  Because the ICA reversed the HiDRO on other grounds, it did not address William's ex post facto arguments.[1]  We address them here.

Under article I, section 10, clause 1 of the U.S. Constitution, "[n]o state shall enter into any . . . ex post facto Law." U.S. Const. art. I, § 10, cl. 1.  Interpreting this clause, the United States Supreme Court has stated, "the true construction of the prohibition extends to criminal, not to civil, cases."  Calder v. Bull, 3 U.S. 386, 399 (1798).  Thus, the ex post facto prohibition has been widely "interpreted to

---

[1]     Because they are not presented to us on certiorari, we express no opinion as to the other issues raised before the ICA.

6

pertain exclusively to penal statutes."  Kansas v. Hendricks, 521 U.S. 346, 370 (1997); State v. Nakata, 76 Hawai'i 360, 375, 878 P.2d 699, 714 (1994) ("The [ex post facto] clause prohibits states from enacting retrospective penal legislation.") (emphasis added); Gray v. Admin. Dir. of the Ct., 84 Hawai'i 138, 141 n.5, 931 P.2d 580, 583 n.5 (1997) (explaining that civil proceedings "do not apply to constitutional ex post facto clauses, which relate only to 'punitive legislation,' i.e. 'prosecutions for crime.'") (citations omitted).  HRS § 88-93.5 is a civil statute concerning the "[d]istribution of property in a divorce action."  Thus, because HRS § 88-93.5 is not punitive in either its intent or its effect, its application here does not "run[] afoul of the federal ex post facto clause."  See State v. Guidry, 105 Hawai'i 222, 235, 96 P.3d 242, 255 (2004).

William's argument under HRS § 1-3 is also unavailing. HRS § 1-3 provides that "[n]o law has any retrospective operation, unless otherwise expressed or obviously intended." Interpreting Hawai'i law on retrospective operation, the United States District Court for the District of Hawai'i has recently distilled the analysis as follows:

> The [Hawai'i Supreme] Court begins its analysis by considering the text of the statute.  If retrospectivity is not clearly stated or the text is ambiguous, the Court will turn to the legislative history.  If the retrospectivity is not clearly stated or the legislative history is ambiguous, the Court will then consider whether application of the statute to [a party] would impair [that party's] existing substantial rights.

7

N.K. Collins, LLC v. William Grant & Sons, Inc., 472 F.Supp.3d 806, 820-21 (D. Haw. 2020).

Put differently, absent any express language limiting the temporal scope of the statute, "the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Gov. Emps. Ins. Co. v. Hyman, 90 Hawai'i 1, 5, 975 P.2d 211, 215 (1999) (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1974)).

Here, HRS § 88-93.5 does not by its plain text expressly limit the temporal scope of the statute. HRS § 88-93.5(a) defines a HiDRO as a domestic relations order that:

> (1)   Creates or recognizes the right of an alternate payee, or assigns to an alternate payee, the right to receive all or a portion of the benefits payable with respect to a member, a former member with vested benefit status, or retirant under the system;
>
> (2)   Directs the system to disburse benefits to the alternate payee; and
>
> (3)   Meets the requirements of this section.

(Emphasis added.)

Clearly, the statute is prospective in its operation in the sense that it "[d]irects the system to disburse benefits

8

to the alternate payee."[2]  See HRS § 88-93.5(a)(2).  However, the statute expressly provides that the right of an alternate payee "to receive all or a portion of the benefits payable with respect to a . . . retirant under the system," may be "create[d] or recognize[d]" by the entry of a HiDRO.  See id. (emphasis added).  This phrasing plainly indicates that a HiDRO may be entered to effectuate payment to a former spouse whose right to the benefit was established prior to the entry of the HiDRO and, in some cases, prior to the ERS member's retirement.  This application is spelled out even more plainly in the legislative history of HRS § 88-93.5.  Act 263, the enacting legislation of HRS § 88-93.5, provides:

> The purpose of this Act is to authorize and require the [ERS] to make direct payments to the spouse or former spouse of an [ERS] member or retirant when the spouse or former spouse has been awarded all or a portion of the member's or retirant's retirement benefits as part of a property division adjudicated, ordered, or decreed by a court in a domestic relations proceeding.

2016 Haw. Sess. Laws Act 263, § 1 at 846 (emphasis added).

Given that the legislature expressly contemplated that a HiDRO may recognize a former spouse's existing rights to a retirant's benefits, it is reasonable to conclude that the

---

[2]     The prospective operation of the statute is further evidenced by the statutory definition of "benefits payable" as "any payment to be made to a member, a former member with vested benefit status, or retirant."  HRS § 88-93.5(a) (emphasis added); see also HRS § 88-93.5(n) (stating that payment according to the terms of a post-retirement HiDRO "shall commence as of the first day of the month following the date upon which the order is determined to be qualified").

9

legislature intended that HRS § 88-93.5 would be invoked to effectuate payments pursuant to judgments or court orders issued prior to the statute's effective date.[3]  The relevant determination is whether the retroactive application of HRS § 88-93.5 in this case, i.e., the entry of a HiDRO, would impair William's substantive rights or merely "prescribe methods of enforcing or giving effect to existing rights" as defined by the family court's prior division orders.  See Clark v. Cassidy, 64 Haw. 74, 77, 636 P.2d 1344, 1347 (1981).

Turning again to the legislative history, in 2015, the Senate Committee on Judiciary and Labor, after voting to approve the provision, reported its finding "that this measure will ensure that a member's or retirant's pension or related benefits are correctly divided pursuant to a divorce action award and promptly paid."  S. Stand. Comm. Rep. No. 1058, in 2015 Senate Journal, at 1274.  The committee further noted that the new provision would "help align [HRS] chapter 88 . . . to the federal Employee Retirement Income Security Act [(ERISA)]."  Id. Under ERISA, by way of amendment through the Retirement Equity

---

[3]     William rejects this conclusion.  He argues that, because Act 30 amending HRS § 88-93.5 "specified that the Act would take effect in the future – on July 1, 2020," the statute should be read only to apply prospectively.  **[App. at 7-8, SC Dkt. 1:9-11]**  This contention is belied by the legislative history of Act 30, which explains that delay of the effective date was not meant to limit the temporal scope of the statute, but rather was "necessary for development and application of necessary resources to support implementation and fund the costs of computer system modifications, ERS member and other affected parties' education, and increased operational costs."  S. Stand. Comm. Rep. No. 3205, in 2018 Senate Journal, at 1363.

Act of 1984, Pub. L. No. 98-397, a former spouse may request entry of a Qualified Domestic Relations Order (QDRO) pursuant to 29 U.S.C. § 1056(d)(3). The QDRO, like a HiDRO, "creates or recognizes the existence of an alternate payee's right to . . . receive all or a portion of the benefits payable with respect to a participant under a plan" provided by the participant's private employer. 29 U.S.C. § 1056(d)(3)(B)(i)(I).

Interpreting the application of a QDRO, Hawai'i courts have held that a QDRO is "merely a collateral enforcement device that will implement the substantive rulings that are already within the [existing order]." Romero v. Romero, Nos. 28664, 28898, 2012 WL 1951328, at *2 (Haw. App. May 31, 2012) (SDO). This treatment of the QDRO is consistent with other jurisdictions that have held "the entry of a QDRO is a method of enforcing or implementing the terms of an existing divorce judgment." Ex parte Montgomery, 79 So.3d 660, 669 (Ala. Civ. App. 2011); Kesting v. Kesting, 370 P.3d 729, 732 (Idaho 2016) ("[W]e agree with other courts that have concluded that a QDRO may be entered to enforce a prior support obligation.") (collecting cases). More specifically, federal courts have expressly held that the QDRO statute may be applied to divorce orders entered prior to the enactment of the statute. Samaroo v. Samaroo, 193 F.3d 185, 187 (3d Cir. 1999) ("Although the Retirement Equity Act was not in effect on [the date of the

11

parties' divorce], plan administrators may, in their discretion, treat orders entered before the date of the Act as QDROs."); John Hancock Mut. Life Ins. Co. v. Timbo, 67 F.Supp.2d 413, 417-18 (D.N.J. 1999) (mem. op.) ("A divorce decree entered prior to the effective date of the Retirement Equity Act can be treated as a QDRO.").

Upon review of the legislative history of HRS § 88-93.5, and the weight of authority relating to the analogous federal statute, we conclude that the family court's application of the HiDRO statute in this case was merely a method of enforcing or giving effect to Barbara's existing rights under the 2019 orders. See Clark 64 Haw. at 77, 636 P.2d at 1346-47.

Barbara's rights to William's ERS retirement benefits were established by the 1990 division order. Those rights were later clarified by the family court's 2012 and 2019 orders. At no point over the two decades of proceedings did William comply with the family court's orders or make any payment from his retirement benefit to Barbara as he was required to do. The family court's order granting HiDRO made clear that the HiDRO was a method of enforcing Barbara's rights as defined by the court's 2019 Orders. The ICA affirmed as much, holding that "the Order Granting H[i]DRO sought to enforce the [2019 orders], rather than amend or alter them." As such, the order granting HiDRO did not further impair William's rights to his ERS

12

benefit, increase his liability for past conduct, or impose on him any new obligations.  See Hyman, 90 Hawaiʻi at 5, 975 P.2d at 215.  Accordingly, entry of the HiDRO pursuant to HRS § 88-93.5 was not an ex post facto violation of William's substantive rights.  See id.

## IV.  CONCLUSION

The ICA's March 5, 2025, Judgment on Appeal is affirmed.

Douglas L. Halsted
for petitioner

Moses K.N. Haia III
for respondent

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Lisa M. Ginoza

/s/ Vladimir P. Devens



13